# WILLIAM McKLVEEN GRANT *v.* STATE OF MARYLAND

[No. 719, September Term, 1982.]

*Decided June 8, 1983.*

2

4

The cause was argued before MOYLAN, LOWE and ALPERT, JJ.

*Fred R. Joseph* and *Shelly E. Mintz,* with whom were *Smith, Joseph, Greenwald & Laake* on the brief, for appellant.

*Patricia E. McDonald, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, Warren B. Duckett, Jr., State's Attorney* for Anne Arundel County, and *Gerald K. Anders, Deputy State's Attorney* for Anne Arundel County, on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

Far from condemning the alert and diligent efforts of the drug enforcement officers in this case, we applaud them. As a result of their efforts, a significant, high-level functionary in an underworld network importing contraband narcotics from Florida into Maryland has been brought to book. We approach this appeal bearing in mind the wisdom expressed by Justice Powell[1] in his concurring opinion in *United States v. Mendenhall,* 446 U.S. 544, 561-562, 100 S.Ct. 1870, 64 L.Ed.2d 497, 514 (1980):

> "The public has a compelling interest in detecting those who would traffic in deadly drugs for personal profit. Few problems affecting the health and welfare of our population, particularly our young, cause greater concern than the escalating use of controlled substances. Much of the drug traffic is highly organized and conducted by sophisticated criminal syndicates. The profits are enormous. And many drugs, including heroin, may be easily concealed. As a result, the obstacles to detection of illegal conduct may be unmatched in any other area of law enforcement."

---

[1] Joining in that opinion were Chief Justice Burger and Justice Blackmun.

The appellant, William McKlveen Grant, was convicted by an Anne Arundel County jury, presided over by Judge Raymond G. Thieme, Jr., of unlawful possession with intent to distribute contraband cocaine and of conspiracy to possess and distribute cocaine. He was discovered at the Baltimore-Washington International Airport to be in possession of 124 grams of 60% pure cocaine. Expert testimony established that that cocaine would be "cut" to a level of 10% purity before it hit the streets of Maryland and that the approximate street value was $48,000. Upon this appeal, the appellant raises five contentions:

(1) That the search of his suitcase and the seizure of the cocaine represented a violation of his Fourth Amendment rights;

(2) That a Corporal Cusimano should not have been allowed to testify as to "the drug courier profile" or as to the street value of the cocaine that was found in the appellant's possession;

(3) That Judge Thieme erroneously refused to grant the defense request for a bill of particulars;

(4) That Judge Thieme erroneously denied the appellant's motion to dismiss the indictment pursuant to Md. Rule 711; and

(5) That Judge Thieme erroneously excluded character evidence offered by the defense.

### The Search and Seizure

We deal first with the suppression issue. The indispensable predicate for the exclusion of highly probative evidence is that the investigative behavior of the police be unreasonable within the contemplation of the Fourth Amendment. Far from being unreasonable, the investigative behavior in this case was a model of both thoroughness

and restraint. Had they done other than what they did, the police would have been derelict and the scourge upon our society that is the drug traffic would have gone on unabated.

The reason for the police investigation in this case was that the appellant and his co-conspirator, Frank Anthony Herrmann, met a number of the telltale characteristics of the so-called "drug courier profile," promulgated by the Drug Enforcement Agency to assist federal and state agents in spotting possible drug couriers. A preliminary word is in order about the special training and the mission of the State Trooper who first questioned the appellant and ultimately seized the appellant's suitcase. Corporal Wayne Cusimano had been a Maryland State Policeman for 15-1/2 years. At the time of the investigation in this case, he had been assigned to the Special Services Intelligence Section for the preceding four years. As a part of his duties with the Special Services Intelligence Section, Corporal Cusimano had been assigned for the preceding five months to the Baltimore-Washington International Airport where his special mission was to intercept drugs coming into Baltimore from certain designated "source cities." During those five months at the Baltimore-Washington International Airport, Corporal Cusimano had received on-the-job training through DEA agents and had attended a DEA seminar on the airport courier situation throughout the country.

An additional preliminary word is also in order about the so-called "drug courier profile." It is a convenient descriptive term without a great deal of legal significance. Some lament the fact that the Supreme Court has not yet told us whether meeting the so-called "drug courier profile" is an adequate predicate to establish either articulable suspicion for a stop or probable cause for an arrest or search. Of course, the Supreme Court has not told us that and they never will. Indeed, they cannot, for there is no such thing as a single drug courier profile; there are infinite drug courier profiles. The very notion is protean, not monolithic. *United States v. Mendenhall, supra,* refers to it as "an informally compiled abstract of characteristics thought typical of persons

carrying illicit drugs." 446 U.S. at 547 n. 1. It is simply an open-ended laundry list of more or less suspicious circumstances, some of which may occur in a particular case.

A larger number of the more suspicious circumstances may well pass constitutional muster in a given case, whereas a smaller number of more ambiguous circumstances will not pass muster in another case. In *United States v. Mendenhall, supra,* the particular characteristics there present were deemed to be enough to establish articulable suspicion for a *Terry*-type stop.[2] In *Reid v. Georgia,* 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980), a different collection of characteristics from the laundry list did not pass constitutional muster. Yet, in the next case, *Florida v. Royer,* U.S. , 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), a different collection of characteristics did pass constitutional muster. There is no inconsistency among these three cases.

It is rather the case that the suppression hearing judge and the reviewing court will look at the actual observations testified to on a case-by-case basis and will decide whether those observations add up to articulable suspicion and/or probable cause, just as if the phrase "drug courier profile" had never been coined. The only legal significance to this umbrella term called "the profile" is that the expertise of the police will be legitimately taken into consideration when we assess the significance of observations that might to the untrained layman seem completely ambiguous. The establishment of the profile by the Drug Enforcement Agency simply gives us the benefit of the collective expertise of many investigators working nationwide in this sensitive area of law enforcement. The special significance that a given observation might have to a trained and experienced policeman could always be established on a case-by-case basis, even if the "profile" did not exist.

---

**2.** Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *See also* its companion case of Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968).

8

Corporal Cusimano was on duty at the airport at 11:15 a.m. on March 13, 1981, when a Delta Airlines flight arrived from Miami/Fort Lauderdale. According to the "drug courier profile," Miami/Fort Lauderdale is a "source city" for narcotics arriving in the Baltimore area. Corporal Cusimano watched the passengers deplane and then followed them to the baggage claim area. He testified that two of the characteristics according to the "profile" were that (1) couriers would typically carry very little by way of luggage and (2) at the baggage claim area, they would frequently stay away from the luggage until they deemed it safe to pick it up. Corporal Cusimano observed the codefendant, Frank Anthony Herrmann, behaving "in a nervous and suspicious manner" as he picked up a small suitcase. He walked abruptly away from the baggage claim area and appeared to glance down at the tag on the bag in a surreptitious fashion. Corporal Cusimano followed Mr. Herrmann to the premium parking lot directly in front of the airport. He observed Mr. Herrmann approach a parked maroon-colored Lincoln, in which the appellant was seated on the driver's side. Mr. Herrmann opened the rear door of the automobile and placed the bag on the rear seat.

To that point, there is nothing remotely requiring constitutional analysis, for Corporal Cusimano was only observing what was visible for anyone to see and no constitutional right of the appellant was even dimly involved.

At that point, Corporal Cusimano approached the automobile and asked whether either Mr. Herrmann or the appellant could produce a claim check. For the next few minutes, there was conversation between the Corporal, on the one hand, and the appellant and Herrmann on the other hand. As each answer provoked new questions, that conversation took on increasingly suspicious overtones. Before recounting it and its legal significance, we preface it with our conclusion that the gears of the Fourth Amendment were not yet engaged. As Justice White observed in his concurring opinion in *Terry v. Ohio, supra,* at 392 U.S. 34, "There is nothing

in the Constitution which prevents a policeman from addressing questions to anyone on the streets." The United States Court of Appeals for the Sixth Circuit spoke to the same issue in *United States v. Collis,* 699 F.2d 832, 835 (1963):

"The average citizen may well elect to stop and respond to inquiries of a law enforcement officer, compelled, perhaps, by a desire to assist the officer in the prevention of crime or, as noted by the lower court, bound by a sense of common courtesy. In neither instance however is the citizen actually or constructively restrained by the authority of the officer."

The opinion for the Court in *United States v. Mendenhall, supra,* explained the distinction between a mere accosting and a *Terry*-type detention, at 446 U.S. 555:

"The respondent was not seized simply by reason of the fact that the agents approached her, asked her if she would show them her ticket and identification, and posed to her a few questions. Nor was it enough to establish a seizure that the person asking the questions was a law enforcement official."

It is also clear that as the conversation progressed, what may have begun as little more than an inchoate hunch, at the moment of the initial and constitutionally innocuous accosting, mushroomed into *Terry*-level articulable suspicion (if such were deemed necessary) with the first brief responses. That articulable suspicion, in turn, almost unquestionably ripened into probable cause (if such were ever deemed necessary) by the time the conversation had progressed for several minutes. The articulable suspicion and/or the probable cause were, however, redundant for, as shall be discussed, the appellant was never restrained or detained even within the contemplation of *Terry.*

We turn our attention to the bizarre conversation and the unavoidable conclusions that any reasonable person would

draw from it. As soon as the appellant observed the Corporal's badge, he became highly nervous and broke out into a profuse sweat. A prudent policeman and a prudent reviewing judge could well wonder why an apparently affluent businessman, who stated that he had been to Florida for several days on a business trip involving possible land purchases, and who drove a Lincoln, would become so nervous and agitated at the modest request to produce a claim check for his suitcase. Neither the appellant nor Mr. Herrmann could produce a claim check.

The less-than-steadfast Mr. Herrmann quickly offered an explanation that he had not been on the flight but had simply picked up the baggage for the appellant, who was Mr. Herrmann's employer. Corporal Cusimano testified that one *modus operandi* used in the drug courier business is for one individual to pick up the bags for someone else.

While looking for a claim check, the appellant produced a one-way ticket from Fort Lauderdale to Baltimore in the name of "W. Grant" and purchased on that very day, March 13. No claim check was stapled to the ticket envelope. Corporal Cusimano testified that it is routine procedure for the claim check to be stapled to the envelope. The Corporal asked the appellant, moreover, why he had not picked up the bag himself since he had to walk right past the baggage claim area on his way to the parking lot. The appellant claimed that he was extremely tired and did not want to wait for the baggage. Corporal Cusimano noted that if his fatigue were that pronounced, it was strange that he was driving the automobile rather than letting his employee, Mr. Herrmann, do the driving.

It was at that point that the appellant explained to the Corporal that he had been in Florida for three or so days to look at some land. Corporal Cusimano asked the appellant whom he had been doing business with in Florida. The appellant gave the name "Bob Holden" but did not know Holden's address and could not remember a telephone number. He seemed to the Corporal to be visibly shaken and confused as to his activities. When asked if he would mind

coming into the terminal where some telephone calls could be made to verify his movements in Florida, he claimed that he was too tired to do so and had to get to his office to make up a payroll.

Mr. Herrmann was then asked about his relationship with the appellant. He responded that he worked for the appellant and had dropped him off "at the airport yesterday." The Corporal noted the inconsistency between this version of the schedule and the appellant's story about having been in Florida for several days. Mr. Herrmann appeared to be in an extremely agitated state and volunteered the information that he did not know what was in the bag and did not know anything about the appellant's activities. Mr. Herrmann then asked if he was under arrest and was assured by the Corporal that he was not. Mr. Herrmann then left to make a telephone call.

Just before Mr. Herrmann left, the Corporal asked for some identification from both the appellant and Mr. Herrmann. The appellant produced his driver's license showing his name as "William McKlveen Grant" and his address as 7894 Chalice Road, Severn, Maryland. The address on Mr. Herrmann's driver's license was 12969 Claxton Drive, Laurel, Maryland.

As the inconsistencies continued to gush forth in a profusion worthy of the Watergate, Corporal Cusimano bore in more doggedly with his questions. As every answer made the appellant increasingly suspect, there was more fully evidenced the wisdom of *Terry v. Ohio*'s call for "an escalating set of flexible responses, graduated in relation to the amount of information [the police] possess." 392 U.S. at 10.

Unable to produce the claim check for the bag, the appellant volunteered the information that there was nothing in it except a pair of old jeans, a pair of tennis shoes, and some dirty underwear. The spareness of the wardrobe seemed strange for a man who had been on a three-day business trip. The appellant refused, moreover, to let Corporal Cusimano look into the bag. A prudent policeman and a prudent reviewing judge could think of many good reasons for such

refusal; the list of good reasons shrinks significantly if the bag did, in truth, contain nothing but a pair of old jeans, a pair of tennis shoes, and some dirty underwear.

At that point, a Trooper Raffel, of the State Police, joined Corporal Cusimano on the parking lot. The appellant was asked one additional time about a claim check. In looking through his pockets on this occasion, he produced yet a second airline ticket. This one also had no claim check stapled to the envelope. This second ticket was an Eastern Airlines round-trip ticket, leaving Baltimore for Fort Lauderdale at 9 a.m. on the day before, March 12, and returning from Fort Lauderdale to Baltimore at 5:30 p.m. on that same day. The date on that ticket also was inconsistent with the appellant's story about having been in Florida for approximately three days. The appellant became very "flustered" when questioned about that ticket. He suddenly claimed that he had missed his return flight and had had to purchase the return flight on Delta. He then changed his story about having been in Fort Lauderdale for a few days, saying that it was just a one-day trip.

The second airline ticket was significant in several ways. It had been paid for in cash. Corporal Cusimano testified that one of the very significant characteristics in the "drug courier profile" was the use of cash to pay for airline tickets. He also testified that changing planes and airlines was a common practice to throw investigators off the scent. Not only had the return flight portion of that Eastern Airlines ticket not been used directly, but it had not been used even as a credit toward the payment of the Delta ticket that became the substitute return flight. No explanation was given for this senseless extravagance.

It was also noted by the officers that the second ticket was in the name of "Fred Grant," whereas the first ticket had been in the name of "W. Grant." When questioned about this, the appellant explained that the round-trip ticket had been purchased for him by his employee, Mr. Herrmann, and that Mr. Herrmann (a most unusual employee) was not familiar with his name.

In the meantime, the ever-faithful Mr. Herrmann had returned to the vehicle. He again asked if he was under arrest and was again assured that he was not. He then volunteered the information that he did not know what was going on but, whatever it was, he had nothing to do with it. He then stated that he was going to catch a cab because he had to relieve a babysitter; he left the area. A prudent policeman and a prudent reviewing judge could not help but wonder what would have happened to that babysitter, if Corporal Cusimano had not chanced upon the scene that morning and Mr. Herrmann had carried on with his occupational mission of driving his boss either to his home in Anne Arundel County or his place of employment to make out the payroll.

Following the desertion of Mr. Herrmann in the face of trouble, the appellant played his trump card. He recanted his story about having gone to Florida on business and now confessed that he had been visiting with a woman and did not want his wife to know about the adulterous liaison. He did not explain, however, why he would fly to Fort Lauderdale and return immediately to Baltimore on the same afternoon, leaving little more than an hour or two at the airport for a strangely slapdash and haphazard adulterous session. Nor did he explain why he would carry with him extra underwear, some old jeans, and a pair of tennis shoes for a single afternoon's adultery.

The appellant was consistently reassured that he was not under arrest and was free to go. He was also told that the bag was going to be confiscated if he did not consent to its inspection. He then protested that the bag contained some "necessary clothes." He was informed by Corporal Cusimano that he had earlier stated that the bag contained only dirty underwear, some jeans, and tennis shoes, and that since he was now at home, moreover, he would have all the clothes he needed. The appellant then claimed that he had to make some telephone calls and see some people.

The Delta Airlines label attached to the bag contained the legible first name "William" but an illegible last name. The

address on the label was "7918 Bower Street, Baltimore, Maryland," but the appellant stated his address was "7916 Tower Court Road, Severn, Maryland." Corporal Cusimano testified that such deliberate confusion of name and address was, once again, a significant characteristic of the "drug courier profile."

The appellant suddenly appeared to become very confused and stated that the bag was not his, because his bag did not have a tag like that. The Corporal asked him if he was disclaiming ownership. At first he said yes but then said no, stating it looked like the bag that he carried but that it might not be his. The Corporal seized the bag and the appellant left the scene.

At that juncture, any reasonably prudent police investigator and any reasonably prudent reviewing judge would have been possessed of well-nigh mathematical certainty that that little bag contained "powerful big" evidence of crime. *A fortiori,* there was abundant probable cause for just such a belief. It is the clear teaching of *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), and *Arkansas v. Sanders,* 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979), that probable cause to believe that a suitcase contains evidence of crime will justify, at the very least, the warrantless seizure of that suitcase for purposes of detaining it while a search warrant is being applied for and hopefully obtained. The Supreme Court has justified this warrantless activity because of the exigency posed by the likelihood of imminent disappearance of the container and its probable contents. In the present case, the police would have been unconscionably derelict and society would have been shamefully ill-served if the appellant had been permitted to drive wantonly away with his contaminating satchel full of plague-spreading contagion.

Even then, the investigating officers were a model of restraint. They carried the seized suitcase into the airport and exposed it, scrupulously unopened, to the trained nose of a cocaine-sniffing police dog. The dog promptly and emphatically "alerted." Adding this additional probability to

the abundant probable cause already possessed, the police applied for and obtained a constitutionally unassailable search and seizure warrant. Under authority of that warrant, they opened the suitcase for the first time and retrieved all of the contraband hereinbefore described.

With respect to the unquestioned propriety of subjecting the suspect suitcase to the trained canine, the Supreme Court was most emphatic in *Florida v. Royer, supra,* at 75 L.Ed.2d 241-242 n. 10:

> "Courts of Appeals are in disagreement as to whether using a dog to detect drugs in luggage is a search, but no Court of Appeals has held that more than an articulable suspicion is necessary to justify this kind of a warrantless search if indeed it is a search. . . .
>
> . . . [W]e hold here that the officers had reasonable suspicion to believe that Royer's luggage contained drugs, and we assume that the use of dogs in the investigation would not have entailed any prolonged detention of either Royer or his luggage which may involve other Fourth Amendment concerns. . . . In the case before us, the officers, with founded suspicion, could have detained Royer for the brief period during which Florida authorities at busy airports seem able to carry out the dog-sniffing procedure." [In the case at bar, the appellant, unlike Royer, was not detained at all but was allowed to drive away].

In the present case, moreover, unlike *Florida v. Royer,* there was no detention of the suitcase for even the briefest of periods for purposes of the canine sniffing, because at the time of the canine sniffing, the suitcase was already in lawful police custody under the authority of *United States v. Chadwick, supra,* and *Arkansas v. Sanders, supra.*

The only colorable Fourth Amendment argument the appellant can even strain to make is that the accumulation of probable cause, as one bizarre and incredible response

piled upon another, was the poisoned fruit of the unconstitutional detention of the appellant in the first instance. As we have already noted, we conclude that Corporal Cusimano's conversation with the appellant was a mere accosting and not even a minimal, *Terry*-type, seizure of the person within the contemplation of the Fourth Amendment. We find highly persuasive in this regard the fact that the co-suspect, Mr. Herrmann, freely walked away first to make a telephone call and then to relieve a babysitter. We find persuasive that the appellant was repeatedly told that he was free to go, although his unsearched suitcase was not. We find persuasive that there was no frisk of the appellant, which is frequently attendant upon a *Terry*-type stop. We find persuasive that the appellant was at no time taken to a room or office of any sort for questioning, but was questioned simply as he sat behind the wheel of his automobile on the parking lot.

Even if this encounter on the parking lot had been a *Terry*-type stop instead of a mere accosting, however, it would have been constitutionally unassailable. If, at some moment during the course of that encounter, the accosting could be deemed to have ripened into a *Terry*-type stop, not only the initial observations but every incredible and highly suspicious response that had occurred up to that moment would be part of the articulable suspicion accumulation. There was at work a direct proportion. For every minute that the conversation was prolonged, the justification for prolonging that conversation still further became more compelling. With every increasing degree of intrusiveness, there was an increased need for intruding. Even in dealing with full-blown *Terry*-type seizures of the person, the Supreme Court has indicated the balancing that will permit a minor Fourth Amendment intrusion to be outweighed by the substantial governmental interest in preventing and detecting crime. *Michigan v. Summers,* 452 U.S. 692, 699, 101 S.Ct. 2587, 69 L.Ed.2d 340, 348 (1981), commented upon this balancing:

"[S]ome seizures admittedly covered by the Fourth Amendment constitute such limited intrusions on the personal security of those detained and are justified by such substantial law enforcement interests that they may be made on less than probable cause, so long as police have an articulable basis for suspecting criminal activity."

In *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), the Supreme Court was dealing with police activity aimed at stopping the flood of illegal immigration across the Mexican border, a national problem but hardly one of the dimensions of the narcotics traffic. In justifying limited searches and seizures as "a valid method of protecting the public and preventing crime," the Supreme Court again spoke of the necessary balancing of interests, at 422 U.S. 881-882:

"[B]ecause of the importance of the governmental interest at stake, the minimal instrusion of a brief stop, and the absence of practical alternatives for policing the border, we hold that when an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion. As in *Terry,* the stop and inquiry must be 'reasonably related in scope to the justification for their initiation.' 392 U.S., at 29, 88 S.Ct. 1868, 20 L.Ed.2d 889. The officer may question the driver and passengers about their citizenship and immigration status, and he may ask them to explain suspicious circumstances. . . ."

For precisely the same reasons, we conclude that Corporal Cusimano was entitled to "question the driver" here and to "ask [him] to explain suspicious circumstances."

Even more emphatically to the point is the teaching of *Adams v. Williams,* 407 U.S. 143, 145-146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972):

> "The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. . . . A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time."

For precisely the same reasons, we conclude that Corporal Cusimano was not constrained "to simply shrug his shoulders and allow a crime to occur." For precisely the same reasons, we conclude that Corporal Cusimano was reasonably entitled "to maintain the status quo momentarily while obtaining more information." *Adams v. Williams,* moreover, involved an actual frisk of the suspect, which the present case, of course, did not.

We find absolutely dispositive of this appeal the two Supreme Court decisions of *United States v. Mendenhall, supra,* and *Florida v. Royer, supra.* Both involved airport stops of suspicious persons who satisfied various characteristics of the "drug courier profile." Both decisions are initially of more than average difficulty in applying, because neither speaks through a single, constitutionally binding majority opinion. Upon careful analysis, however, each opinion does involve some constitutionally binding principles of law that wind as common threads through enough plurality, concurring, and dissenting opinions to command clear majorities of the Court.

We turn our attention first to *Mendenhall.* DEA agents were there present at the Detroit Metropolitan Airport "for the purpose of detecting unlawful traffic in narcotics," just as Corporal Cusimano was present at BWI for the same purpose. Sylvia Mendenhall arrived at that airport from a "source city" (Los Angeles), just as the appellant here

arrived from a "source city" (Fort Lauderdale). Mendenhall there "proceeded past the baggage area without claiming any luggage," just as the appellant did here. Mendenhall there changed airlines for her flight out of Detroit, just as the appellant had changed from Eastern Airlines to Delta Airlines for his flight back from Fort Lauderdale. Mendenhall there appeared to be very nervous, just as the appellant here appeared very nervous. Two agents there approached Mendenhall as she was walking through the concourse, just as Corporal Cusimano here approached the appellant on the parking lot. The agents there requested to see Mendenhall's identification (her driver's license) and her airline ticket, just as the appellant here produced upon request a driver's license and ultimately two airline tickets. Mendenhall's airline ticket had been issued in the name of "Annette Ford," whereas the appellant's two tickets had been issued in the inconsistent names of "W. Grant" and "Fred Grant." When asked for an explanation there as to the inconsistency, Mendenhall responded that she "just felt like using that name"; the appellant here explained that his employee didn't know his right name.

At that point, the similarity between *Mendenhall* and the present case ceases, as the intrusion in the *Mendenhall* case became much more significant. Mendenhall was asked to accompany the officers to the DEA office for further questioning. She did so. She was there asked to consent to a search of her person and her handbag, and she did so. She was ultimately subjected, in the presence of a police matron, to a strip search and produced two small bags of heroin from her underclothing.

A clear majority of the Supreme Court, five Justices, found the ultimate search to be constitutional. The two-Justice opinion for the Court and the three-Justice concurring opinion, however, travelled slightly different routes to that finding of constitutionality.

In dealing with the encounter between the DEA agents and Mendenhall up until the time that she consented to go with them to the DEA office (that part of the encounter that

so closely resembles the total encounter in the present case), Justice Stewart, joined by Justice Rehnquist, concluded that no seizure of Mendenhall had occurred and that Fourth Amendment analysis was, therefore, not even called for. That opinion pointed out, at 446 U.S. 555, that the "agents wore no uniforms" (as here) and that they "displayed no weapons" (as here). That opinion also pointed out that they "did not summon the respondent to their presence, but instead approached her and identified themselves as federal agents" (as was, again, the situation here). That opinion pointed out that they "requested, but did not demand to see the respondent's identification and ticket" (as was, again, the situation in this case). They concluded that "[s]uch conduct, without more, did not amount to an intrusion upon any constitutionally protected interest." They pointed out that "[t]he purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry." 446 U.S. at 553.[3]

In finding that there was no detention within the contemplation of the Fourth Amendment, the Stewart opinion observed, at 446 U.S. 552, quoting *Terry v. Ohio, supra,* at 392 U.S. 19 n. 16:

" 'Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred.' "

and amplified that observation, at 446 U.S. 554:

"Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that com-

---

**3.** *Quoting also* from the concurring opinion of Justice Harlan in Terry v. Ohio, *supra,* at 392 U.S. 31, 32-33, where he observed that police officers enjoy "the liberty (again, possessed by every citizen) to address questions to other persons."

pliance with the officer's request might be compelled."

Arriving at the same result via a different rationale, the concurring opinion of Justice Powell, joined in by Chief Justice Burger and Justice Blackmun, did not necessarily disagree with the Stewart conclusion that there had been no seizure within the contemplation of the Fourth Amendment, but chose not to address that issue since it had not been decided by the court below. The concurring opinion travelled the route that even assuming, *arguendo,* a *Terry*-type seizure, adequate articulable suspicion was present to make such a seizure reasonable. That concurring opinion also recited the collection of suspicious circumstances already described and commented particularly, at 446 U.S. 563-564, on the weight that should be given to the special expertise of the officer in evaluating otherwise ambiguous activity:

> "In reviewing the factors that led the agents to stop and question the respondent, it is important to recall that a trained law enforcement agent may be 'able to perceive and articulate meaning in given conduct which would be wholly innocent to the untrained observer.' *Brown v. Texas, supra,* at 52, n. 2, 99 S.Ct. 2637, 61 L.Ed.2d 357. Among the circumstances that can give rise to reasonable suspicion are the agent's knowledge of the methods used in recent criminal activity and the characteristics of persons engaged in such illegal practices. Law enforcement officers may rely on the 'characteristics of the area,' and the behavior of a suspect who appears to be evading police contact."

The plurality opinion pointed out the obligation of reviewing courts to give special credence to this expertise, at 446 U.S. 565-566:

> "In applying a test of 'reasonableness,' courts need not ignore the considerable expertise that law

enforcement officials have gained from their special training and experience." [4]

That plurality opinion concluded with specific reference to the great public interest in curbing the drug traffic and to the special enforcement problems "in an airport known to be frequented by drug couriers":

"The public interest in preventing drug traffic is great, and the intrusion upon respondent's privacy was minimal. The specially trained agents acted pursuant to a well-planned, and effective, federal law enforcement program. They observed respondent engaging in conduct that they reasonably associated with criminal activity. Furthermore, the events occurred in an airport known to be frequented by drug couriers." 446 U.S. at 565.

The mere fact that *Mendenhall* enjoyed no majority opinion for its entire statement does not erode the precedential authority of those parts of the opinion which command a clear majority. Where two Justices hold that the activity of the police investigators was so minimal and unoffending as not even to require the satisfaction of *Terry* and where three other Justices hold that the activity of the police investigators was so reasonable as to satisfy *Terry,* even if *Terry* applied, the constitutionally binding common denominator is that the activity of the police investigators was not unreasonable under *Terry* (the highest standard that any of the five would apply) and that probative evidence will not, therefore, be suppressed. Leaving for academicians to ponder whether *Terry* is inapplicable or *Terry* is satisfied, the police activity in the present case was, by one theory or the other, clearly constitutional under the authority of the *Mendenhall* consensus. The satisfaction of the more rigorous constitutional standard embraces the satisfaction of a less rigorous constitutional standard.

---

**4.** United States v. Brignoni-Ponce, *supra,* had stressed the same point, at 422 U.S. 885, that "[i]n all situations the officer is entitled to assess the facts in light of his experience."

The constitutionally binding consensus that emerges from *Florida v. Royer,* has an even more interesting provenance. There is a large portion of the four-Justice plurality opinion [5] with which the four dissenting Justices [6] most emphatically agree. When Mark Royer arrived at the Miami International Airport on January 3, 1978, two plain-clothes detectives assigned to narcotics investigation concluded that he satisfied a number of the significant characteristics of the "drug courier profile." The investigation that followed can be parsed into two constitutionally distinct phases. Royer was first stopped by the investigators in a public concourse, was questioned by them, and turned over upon their request his airline ticket and his driver's license. The two detectives informed Royer that they were narcotics investigators and that they had reason to suspect him of transporting narcotics. This concluded the first distinct phase of the total encounter.

The second phase began when the agents failed to return the airline ticket and driver's license and asked Royer to accompany them to a room some forty feet away. Royer did not respond but nevertheless went with the detectives. The room was described as a "large storage closet" and contained a small desk and two chairs. Without obtaining Royer's consent, one of the detectives used Royer's baggage check stub, at that point in police custody, and retrieved Royer's luggage from the airline. Royer was asked to consent to a search of the suitcase. He did not respond but did produce a key to the suitcase. One of the detectives then opened it without seeking further assent from Royer. A second suitcase was pried open by the police when Royer indicated that he could not remember the number to the combination lock.

---

**5.** Written by Justice White and joined in by Justices Marshall, Powell, and Stevens.

**6.** Justice Blackmun wrote a dissenting opinion. Justice Rehnquist wrote a separate dissenting opinion in which Chief Justice Burger and Justice O'Conor joined. Only the concurring opinion of Justice Brennan declined to join in the constitutional consensus discussed above.

The intermediate appellate court of Florida reversed the conviction, holding both (1) that the similarity with the "drug courier profile" was not sufficient to constitute articulable suspicion to justify even the initial stop in the concourse and (2) that there was no probable cause to justify the subsequent confinement of Royer in the room under conditions which amounted to a *de facto* arrest. This unlawful *de facto* arrest, they held, vitiated any arguable consent to the search of the suitcases.

The majority of the Supreme Court affirmed the intermediate appellate court of Florida in its holding that the ultimate search of the suitcases was unconstitutional. The plurality opinion of four Justices, however, disagreed with the Florida court with respect to the initial *Terry*-type stop.

They concluded unequivocally that there was sufficient articulable suspicion to render the initial stop and questioning reasonable under *Terry,* saying at 75 L.Ed.2d 235 n. 7:

> "The Florida court was also of the opinion that 'a mere similarity with the contents of the drug courier profile is insufficient even to constitute the articulable suspicion required to justify' the stop authorized by *Terry v. Ohio.* . . . As will become clear, we disagree on the reasonable-suspicion issue. . . ." (Citation omitted).

The plurality opinion concluded that the police activity was reasonable throughout the first phase of the encounter but only degenerated into the unreasonable when it moved on to the stage of *de facto* arrest in the small, confined room. The plurality went to great lengths to explain how less intrusive alternatives could have been used to follow up the first phase of the encounter so that the police could have completed their investigation in a fashion that would not have offended the Constitution. The four dissenting Justices only took issue with that part of the plurality opinion that found even the second phase of the encounter to be unconstitutional.

Whatever the four-Justice plurality of *Florida v. Royer* has held to be constitutional investigative procedure is the law of the land. Four Justices have held the investigative activity to be reasonable up to a very definite point; four other Justices agree that the investigative activity was not only reasonable up to that point but remained reasonable even well beyond that point. The reasonableness of the investigative activity up to that point, therefore, quite obviously commands the broad support of eight Supreme Court Justices. In measuring the case before us against the *Florida v. Royer* standard, we will examine only that part of the *Florida v. Royer* opinion that commands this solid majority support.

The two plain-clothes detectives in the *Royer* case believed that Royer's "appearance, mannerisms, luggage, and actions fit the so-called 'drug courier profile.' " Royer was leaving from a "source city," even as the appellant here was arriving from a "source city." Royer had purchased a one-way ticket to New York City, even as the appellant here had a one-way ticket from Fort Lauderdale. The identification on two suitcases in that case was deliberately vague, even as the identification in this case was misleading. There was a discrepancy there between the correct name of "Royer" on a driver's license and the name "Holt" on the airline ticket, even as there was the discrepancy between the names on the two airline tickets in the case before us. Royer there, as in the case before us, offered a palpably "phony" explanation; he explained that a friend had made the reservation for him in the name of "Holt." Royer there, as the appellant here, became "notably more nervous" when the detectives identified themselves as narcotics investigators.

Royer was initially approached as he was making his way to the concourse which led to the airline boarding area. The two detectives identified themselves and asked Royer if he had a moment to speak with them; he replied, "Yes." With respect to that initial questioning on the public concourse, which significantly paralleled the questioning of the appellant on the parking lot in this case, the Supreme Court observed, at 75 L.Ed.2d 236:

"[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions . . . . Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification."

The two detectives requested Royer to produce his airline ticket and his driver's license. Without consenting orally, Royer handed over the two documents. With respect to this, the plurality observed, "Asking for and examining Royer's ticket and his driver's license were no doubt permissible in themselves. . . ." *Id.* at 239. When the detectives retained the driver's license and the ticket instead of returning them, however, the Supreme Court plurality agreed that the mere accosting had escalated into a "stop" within the contemplation of *Terry v. Ohio.* In view of the suspicious circumstances hereinbefore described, the Supreme Court plurality thought that there was, to that point, sufficient articulable suspicion to justify a *Terry*-type stop. They pointed out, at 75 L.Ed.2d 237, "Royer does not suggest, nor do we, that a similar rationale would not warrant temporary detention for questioning on less than probable cause where the public interest involved is the suppression of illegal transactions in drugs or of any other serious crime." With particular reference to the articulable suspicion as to Royer himself, the Supreme Court plurality observed, at 75 L.Ed.2d 239:

"We agree with the State that when the officers discovered that Royer was travelling under an assumed name, this fact, and the facts already known to the officers — paying cash for a one-way ticket, the mode of checking the two bags, and Royer's appearance and conduct in general — were adequate grounds for suspecting Royer of carrying

drugs and for temporarily detaining him and his luggage while they attempted to verify or dispel their suspicions in a manner that did not exceed the limits of an investigative detention."

It was only when the detectives in that case took Royer to the small, confined room that the investigative activity went beyond what the plurality opinion believed to be a reasonable *Terry*-type stop and ripened instead into a full-blown arrest. It was only at that point that the activity in the *Royer* case deviated from its parallel to the case before us. The Supreme Court plurality pointed out at least three different ways in which less intrusive investigative behavior could have saved the investigation from being condemned as unreasonable. The three recommendations as to how to be less intrusive are virtually commendations of the investigative behavior now under our review.

The Supreme Court first observed, at 75 L.Ed.2d 241:

"We also think that the officers' conduct was more intrusive than necessary to effectuate an investigative detention otherwise authorized by the *Terry* line of cases. First, by returning his ticket and driver's license, and informing him that he was free to go if he so desired, the officers may have obviated any claim that the encounter was anything but a consensual matter from start to finish."

In the present case, the appellant's driver's license and his airline tickets were returned to him. He was, moreover, repeatedly informed that he was not under arrest and that he was free to go.

The Supreme Court plurality then observed that it would have been more reasonable if the requested consent for the search of Royer's suitcases had been sought "on the spot," rather than in the small, confined room. Such consent, had it been forthcoming under those circumstances, would unquestionably have been voluntary and reasonable. "As we have noted, had Royer consented to a search on the spot, the search could have been conducted with Royer present in the

area where the bags were retrieved by Officer Johnson and any evidence recovered would have been admissible against him." *Id.* The Supreme Court plurality stated clearly that Royer's initial detention was justified, as they limited their criticism to the incremental intrusion of moving the questioning from the public area to the small, confined room:

> "The record does not reflect any facts which would support a finding that the legitimate law enforcement purposes which justified the detention in the first instance were furthered by removing Royer to the police room prior to the officer's attempt to gain his consent to a search of his luggage." *Id.*

By pleasant contrast, the appellant here was never carried to an office or other confined space. When Corporal Cusimano sought consent for the search of the suitcase, he sought it right there on the parking lot. The appellant was never under arrest, *de facto* or otherwise. The strongest evidence that he was free to leave the scene was the fact that he did leave the scene, just as his companion, Mr. Herrmann, had earlier left the scene.

The third fashion in which the Supreme Court plurality suggested the investigation might have been conducted so as to be less intrusive again operates as a commendation of the police behavior in this case. In recommending the use of a drug-sniffing canine, the Supreme Court indicated that a positive alert would have resulted in "justifiable arrest on probable cause":

> "[T]he State has not touched on the question whether it would have been feasible to investigate the contents of Royer's bags in a more expeditious way. The courts are not strangers to the use of trained dogs to detect the presence of controlled substances in luggage. There is no indication here that this means was not feasible and available. If it had been used, Royer and his luggage could have been momentarily detained while this investigative

procedure was carried out. Indeed, it may be that no detention at all would have been necessary. A negative result would have freed Royer in short order; *a positive result would have resulted in his justifiable arrest on probable cause." Id.* at 241-242. (Emphasis supplied).

The appellant can hardly complain that the detention of his suitcase amounted to an unlawful and *de facto* detention of him, since *Florida v. Royer* indicates that it would have been reasonable to detain directly and explicitly both him and his suitcase.

Since we hold that the questioning of the appellant in this case did not represent any primary illegality in the first instance, it follows that the accumulation of probable cause for the warrantless seizure of the suitcase that developed in the course of that questioning did not represent any unconstitutional exploitation of the primary illegality. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). We hold that the physical evidence was properly admitted.

## Expert Testimony

The appellant complains that Corporal Cusimano should not have been permitted to testify as an expert on either the "drug courier profile" or the street value of the seized cocaine. The law in Maryland in this regard is well-settled. *Raithel v. State,* 280 Md. 291, 301, 372 A.2d 1069 (1977), pointed out that the:

> ". . . admissibility of expert testimony is a matter largely within the discretion of the trial court, and its action in admitting or excluding such testimony will seldom constitute a ground for reversal."

*See also Winkles v. State,* 40 Md.App. 616, 622-623, 392 A.2d 1173 (1978); *Kohr v. State,* 40 Md.App. 92, 388 A.2d 1242 (1978); *Butler v. State,* 19 Md.App. 601, 313 A.2d 554 (1974).

Corporal Cusimano had been a Maryland State Trooper for 15-1/2 years and had been assigned for four of those years to the Special Services Intelligence Division; he had been stationed at the BWI Airport in the narcotics section of the intelligence field for approximately five months prior to the arrest in this case; he had had on-the-job training at the airport through federal DEA agents and had attended a DEA seminar dealing with the "drug courier profile." In assisting the jury to understand the characteristics of the drug traffic throughout the country and to appraise accurately the value of the seized cocaine, Corporal Cusimano served a valuable function in the search for truth. We see no abuse of discretion on the part of Judge Thieme in permitting this testimony.

### Failure to Furnish a Bill of Particulars

The appellant filed a request for a bill of particulars, especially with respect to the conspiracy charge. The State did not furnish particulars, and the trial court did not order that particulars be furnished. It appears that there may have been a technical violation of Md. Rule 730, but it is also quite clear to us that the appellant was not prejudiced in any way. In setting forth the obligation upon the State to respond to a request for a bill of particulars, Md. Rule 730b is explicit:

> "Within ten days after service of the demand the State shall file a bill of particulars which furnishes the particulars sought or it shall state the reason for its refusal to comply with the demand."

If the State feels that a defendant's request for particulars is not well-grounded, the State is under no obligation to furnish particulars. The State is not, however, free simply to ignore the request. The rule imposes the square obligation upon the State to set forth the reason for its refusal to comply. As Judge Orth pointed out for this Court, however, in *Polisher v. State,* 11 Md.App. 555, 587, 276 A.2d 102 (1971), "No sanction is prescribed by the Rule for failure to comply

with it." The handling of the situation is wisely left in the wide discretion of the trial judge to fashion a sanction or to fashion compliance in a balanced way compatibly with the interests of both parties and with the circumstances of the case then before him. In this case, it appeared that the State thought that it had substantially complied with the request for the bill of particulars by opening its file to the appellant. In a hearing on a number of pretrial motions, this issue came up before Judge Thieme on August 28, 1981, and the following brief exchange capsulized what was really in issue:

> "Mr. Joseph: The next motion, uh, we received a note that on motion for bill of particulars that Judge Childs had denied our motion for bill of particulars indicating that discovery has been provided in a memo dated July 30th. He merely indicated refused. Discovery has been provided. Our position is that in regard to the charge of conspiracy and we're honing in on the, on this conspiracy charge, that the defendant should have a right to have some type of particulars as to the overt acts and the specifics forming the basis for the conspiracy.
>
> Court: The State didn't let you see its file?
>
> Mr. Joseph: Open file is being permitted and we don't claim that it's not and there's been no problem in that regard.
>
> Court: If you want the information, you've got the information then. But what you're really asking is that you want something technical other than the actual information.
>
> Mr. Joseph: Well, I think that the — we're — well, we're requesting the Court to do is to require the State to set a confines of the conspiracy so that the defendant is placed on notice and to require —
>
> Court: I don't think that the law sets a confines on the conspiracy. As I understand the law, they can go clearly up to the date of the indictment. And there's some law across the country to even go beyond the date of the indictment as to the conspiracy.

Mr. Joseph: I realize that, Your Honor. It's our, our position that the State has an obligation to set out the specific acts that they contend form the basis for the conspiracy and, in fact, to stand by those acts which they indicate form such a basis. We don't believe that the State has the right to merely give us open file discovery and then say everything within the spectrum of this entire case would form the basis of the conspiracy. The State should not have a right to pick and choose at the time of the trial as to what it contends will be a part of this drag net. And I think the courts, as a result of the broadening of the conspiracy laws, has, have required more specificity in regard to that charge as opposed to a substantive offense."

On the open-and-shut facts of this case, it is difficult to imagine a way in which the appellant was handicapped in his defense, and he suggests none. The appellant did not object at trial to any evidence on the ground that he was surprised. " 'The purpose of a bill of particulars is to secure facts, not legal theories.' " *Hadder v. State,* 238 Md. 341, 351, 209 A.2d 70 (1965).

Without excusing the technical failure of the State to comply with the express requirements of Md. Rule 730b, we think the issue was effectively presented before Judge Thieme. The State made known its position that the opening of its files gave the appellant the benefit of any facts it intended to prove. The State's position, moreover, was that it was not required to furnish its legal theory of conspiracy. Although, in some other case involving a complicated conspiracy theory or unanticipated proof of that conspiracy, a defendant might be able to claim legitimate surprise, no such surprise remotely occurred here. The events that occurred on the parking lot at the Baltimore-Washington International Airport when Corporal Cusimano confronted the appellant and Mr. Herrmann, were the sum total of the State's proof with respect to both the substantive offense and the conspiracy charge. Although the appellant may, pretrial,

have had fears of being surprised, no such surprise ever eventuated. Under the circumstances, we see no abuse of discretion on the part of the trial judge.

The appellant does not even now suggest what relief he thinks appropriate. If he means to imply that a reversal of the conviction is called for, such an implication is absurd. Technically, the State was under an obligation "to answer its mail" in a more formal fashion than it did. Once the appellant's demand for the particulars and the State's reluctance to supply them were before the hearing judge and opposing counsel were also before the hearing judge with full opportunity to be heard, we cannot say that he abused his discretion in dealing with the matter on the merits rather than compelling specific performance on the part of the State simply for its failure to "R.S.V.P." in timely and appropriate fashion. Even in presenting his claim to us, the appellant speaks of his potential plight pretrial rather than his actual plight at trial, as he points out that he "stood at risk of surprise at trial." Whatever the legitimate fear of surprise may have been, in the last analysis that surprise never came to pass.

## Maryland Rule 711

The appellant claims that the charging document should have been dismissed pursuant to Md. Rule 711 because it did not adequately identify the time and place of the charged offense. The appellant admits that the indictment specified the day in question but objects that it did not identify the precise time of day. Under both the law and the facts of this case, the contention is frivolous and we decline to dignify it further. *Bonds v. State,* 51 Md.App. 102, 106-108, 442 A.2d 572 (1982).

## Character Evidence

The appellant did not take the stand in his own defense. Notwithstanding that fact, his counsel sought to present character witnesses on his behalf. The witnesses were to attest to the fact that (1) he had no criminal background and (2) he had a good reputation for honesty and veracity. The pertinent exchange was:

> "Mr. Joseph: Your Honor, uh, I would, I would, uh, pro — well, I would take the stand that he should be permitted to present character witnesses in his own behalf so that the jury may take into consideration um, —
>
> The Court: — Character witnesses as to what?
>
> Mr. Joseph: As to his honesty and veracity and the general reputation in the community for honesty and veracity and the fact that he has never been involved in any illegal, criminal background, including the use of drugs. I would proffer that we have two witnesses who would testify to that effect, to that fact, and individuals who have known the defendant in excess of five years.
>
> The Court: His veracity is not at issue until he takes the stand. Nobody's contradicting him. No, the — it's ridiculous to put on a character witness as to something that's not at issue. The Court won't permit it."

Shortly thereafter in this same exchange, the proffer was alluded to again:

> "Mr. Anders: Your Honor, in, in the interest of avoiding any error here, it is my understanding that the character witness is for the purpose of testifying as to his truth and veracity in the community. Is that correct?
>
> Mr. Joseph: Truth and veracity and crime-free background and the fact that his general reputation in the community has been one of uh, totally

honest, with integrity, and not having ever been involved with drugs of any kind.

Mr. Anders: Your Honor, I would object. I don't think that that's admissible."

The court declined to receive evidence bearing on the appellant's character.

The appellant seeks solace in *dicta* found in *Braxton v. State,* 11 Md.App. 435, 439, 274 A.2d 647 (1971):

"As distinguished from the limited concept of character within the impeachment rule as relating only to credibility, a defendant may always offer evidence of his good character and to prove that his character was such as to make it unlikely that he would have committed the act charged against him. The defendant does not put his 'character' in this frame of reference in issue by merely taking the stand as a witness. It is put in issue, however, when he states that he has good character or a good record, or offers direct evidence of good character."

*Braxton,* moreover, quoted extensively and with approval from 1 *Wharton's Criminal Evidence* (12th Ed.), §221, at 458-459, wherein *Wharton* begins:

"The defendant is not required to testify as a witness before offering character evidence on his own behalf. He may call witnesses for that purpose although he does not himself testify as a witness."

We hold that the above statement of law from *Wharton* is a correct one and that the appellant is, therefore, correct to the limited extent that he makes the general claim that he was entitled to offer evidence of his good character even though he did not take the stand himself. If the trial judge seemed to indicate that the appellant could in no event put on evidence of his good character simply because he did not take the stand, the trial ruling was much too austerely limiting. A general entitlement to offer evidence of good character, however, does not relieve the appellant from the

normal requirements of relevance. That same section from *Wharton,* also quoted with approval by *Braxton,* at 11 Md.App. 440, goes on to point out:

> "Neither the defendant nor the prosecution may offer evidence of general good or bad character. To be relevant, it is necessary that the character be confined to an attribute or trait the existence or nonexistence of which would be involved in the noncommission or commission of the particular crime charged. This, of course, depends upon the moral wrong involved in the commission of the crime charged.[3]

Two quite distinct aspects of character were referred to in the proffer: (1) "truth and veracity" and (2) "crime-free background." They require different analyses.

With respect to the absence of any prior criminal record, the appellant cites no authority for the proposition that the lack of a criminal record is an acceptable way of showing good character; we know of no such authority. Indeed, the very section from *Wharton,* quoted with authority by *Braxton,* at 11 Md.App. 441, goes on to state emphatically:

> "Evidence that the defendant has never been arrested is inadmissible."

The mechanics of proving the absence of a criminal record would be extremely difficult to master. Does one check only with the custodian of criminal records of the local county or municipality? Does one hope for a means to check for such records on a statewide basis? How many other states must also be checked? Does an FBI computer check represent an adequate national check for criminal records? How does one

---

3. " 'It is irrelevant to show the defendant's reputation for honesty and integrity in a prosecution for adultery; for truth and veracity, or peace and quietude, in a prosecution for statutory rape; for good military conduct in a rape prosecution; for truth and veracity in a robbery prosecution; or for honesty and integrity, in a murder prosecution; for morality and sobriety in a prosecution for a false bank report entry; or for reliability in business in a prosecution for the malicious destruction of property.' "

know what aliases might have been used? Is it enough that there have been no prior convictions or must there also have been no prior indictments? No prior arrests? The short answer is that the proffer in this regard did not meet the requirement of relevance on the issue of good character.

On the issue of "truth and veracity," the support the appellant finds in *Braxton* is very insubstantial. In *Braxton,* the appellant actually took the stand and put his testimonial credibility directly in issue. Braxton, on trial for armed robbery and identified by two victims, swore under oath that he was not present at the robbery scene and had nothing to do with the crime. His defense character witness was also his alibi witness. In addition to furnishing the alibi, that witness swore that he knew Braxton's "reputation for honesty and truthfulness in the community in which he lives . . . he has a reputation for good character and honesty, trustworthy [sic]." With presence at the scene being a hotly contested issue, two witnesses versus two witnesses, the element of Braxton's character took on a more pivotal aspect than it might ordinarily possess. The literal question before this Court in the *Braxton* case was whether the defendant was entitled to an instruction to the effect that the jury could take the evidence of Braxton's good character into consideration in terms of assessing reasonable doubt. We were there of the opinion that Braxton was prejudiced by the court's failure to give the instruction for the reason that, "We cannot say that a reputation for being honest and trustworthy is irrelevant in a prosecution for robbery." 11 Md.App. at 442.

In *Braxton,* moreover, the issue of admissibility was not before the Court. We pointed out squarely, at 11 Md.App. 441-442, that the testimony all came in without objection:

> "We have noted that Johnson's testimony of his knowledge of Braxton's reputation in the community in which he resided came into evidence without objection. Thus there was before the jury that Braxton had a reputation for 'good character and honesty, trustworthy.' "

The *Braxton dicta* did, of course, permit a broader inter-
pretation than the facts of *Braxton* would call for. A year
later, however, *Hallengren v. State,* 14 Md.App. 43, 286
A.2d 213 (1972), went a long way toward limiting that *dicta.*
We there pointed out, speaking through Chief Judge
Murphy, that although truth and veracity ordinarily were
relevant considerations only with respect to testimonial
credibility, they did have occasional relevance on the issue
of indisposition to commit crime where the crime in question
was of the *crimen falsi* variety. In stressing that the trait of
character sought to be proved must be a relevant trait of
character with respect to the crime in question, we observed,
at 14 Md.App. 49-50:

> "We concluded that Braxton's reputation for 'good
> character and honesty, trustworthy' was not irrel-
> evant in a prosecution for robbery. The case was a
> close one, and we observed that Braxton argued to
> the jury that since he was endowed with such good
> character traits, it was unlikely that he would
> commit armed robbery. We concluded, in the cir-
> cumstances of the case, that Braxton was 'entitled
> to an instruction that the [good character] evidence
> should be taken into consideration by the jury in
> connection with all the other evidence in the case
> and, in arriving at their verdict of guilt or inno-
> cence, given such weight under all the facts and
> circumstances of the case, including the credibility,
> as determined by the jury, of the witness testifying
> as to Braxton's reputation, as it merits in the judg-
> ment of the jury.'
>
> Unlike the factual situation in *Braxton,* the testi-
> mony pertaining to appellant's good reputation for
> truth and veracity was not relevant to demonstrate
> that it was unlikely that he would commit the
> crimes with which he was charged. A person whose
> reputation for truth and veracity is good is no less
> likely a candidate to violate Sections 121 and 123
> than a person whose reputation for those traits is

bad. A good reputation for truth and veracity is a character trait relevant to credibility, and we think it plain from the record that appellant's only purpose in offering such testimony was to support or bolster his own credibility as a witness in order to convince the jury that he, and not the police, should be believed. While appellant had a right to prove that he possessed traits of character which would entirely restrain him from committing the crimes alleged, . . . and could, in view of the nature of the offenses charged against him, have undertaken to prove that his reputation for peace and quietude was good, . . . he did not pursue this line of defense." (Citations omitted).

We hold that although a reputation for truth and veracity would be relevant upon the trial of a charge such as perjury, false pretenses, or embezzlement, it has no bearing on the likelihood to commit an offense involving narcotic drugs. The drug traffic is commercialized vice at its highest and most sinister level. Just as a good reputation for truth and veracity does not make one less disposed to violate the gambling laws, the prostitution laws, the bootlegging laws, neither does it make one less disposed, we hold, to violate the laws proscribing the use and distribution of marijuana, cocaine, and other mind-altering drugs. We see no error in the trial court's ruling that the proffered evidence was irrelevant.

Even if properly proved, moreover, evidence of good character was of such marginal significance in this case as to be nugatory. Once the physical evidence was admitted, there was no defense to the charges at bar and the appellant mounted no defense. The only possible issue that the jury might have had to decide was whether, in light of the extremely large quantity of cocaine recovered, the appellant was a very large user or a distributor. The issue there is not one of distinguishing good character from bad character but only bad character from worse character. Even if there had been technical error in rejecting the defense evidence (and we hold that there was not), the impact was so insignificant

as to be nonexistent. In the interest of judicial economy, we point out by way of alternative holding that we have combed the record thoroughly with this consideration deliberately in mind and we are persuaded beyond any doubt that this evidentiary ruling had no effect on the jury's verdict whatsoever. Even if there had been error, it was palpably harmless. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Dorsey v. State,* 276 Md. 638, 350 A.2d 665 (1976). In *Taylor v. State,* 278 Md. 150, 152, 360 A.2d 430 (1976), the Court of Appeals dealt with an evidentiary error to the detriment of a defendant offering evidence that he was a "peaceful man" upon his trial for murder. Notwithstanding that error, they held, "[W]e believe that the cross-examination of the character witnesses as regards the defendant's prior convictions, while error as a matter of Maryland law, was harmless error beyond a reasonable doubt." As recently as May 23, 1983, the Supreme Court in *United States v. Hasting,* 33 Cr.L. 3091, has reaffirmed the common-sense conclusion that even a constitutional violation (in that case an impermissible comment upon the defendant's failure to take the stand, in contravention of the Fifth Amendment privilege against compelled self-incrimination) can be harmless error. *See also Milton v. Wainwright,* 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972), (a violation of the Sixth Amendment right to confront one's accusers). In *United States v. Hasting,* the Supreme Court concluded, at 33 Cr.L. 3094:

> "[G]iven the myriad safeguards provided to assure a fair trial, and taking into account the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and ... the Constitution does not guarantee such a trial. . . . [W]hen courts fashion rules whose violations mandate automatic reversals, they 'retreat from their responsibilities, becoming instead "impregnable citadels of technicality." ' " (Citations omitted).

> *Judgments affirmed; costs to be paid by appellant.*