467 A.2d 776

**Michael Joseph DULEY**

v.

**STATE of Maryland.**

**No. 1960, Sept. Term, 1982.**

Court of Special Appeals of Maryland.

Nov. 7, 1983.

**276**

John Kopolow, Asst. Public Defender, with whom was Alan H. Murrell, Public Defender, on the brief, for appellant.

Zvi Greismann, Asst. Atty. Gen., with whom were Stephen H. Sachs, Atty. Gen., and Warren F. Sengstack, State's Atty. for Calvert County, on the brief, for appellee.

Submitted before GILBERT, C.J., and ALPERT and BLOOM, JJ.

GILBERT, Chief Judge.

As a result of a nonjury trial in the Circuit Court for Calvert County, Michael Joseph Duley was convicted of child abuse (Md.Ann.Code art. 27, § 35A) and manslaughter in connection with the death of his daughter. The trial judge sentenced Duley to fifteen years imprisonment on the abuse charge and suspended imposition of the sentence on the manslaughter conviction.[1]

On appeal to this Court, Duley posed four issues. We have, however, combined the questions on sufficiency of the evidence into one issue, reducing the number of arguments to three.

## I.

"The trial court lacked jurisdiction to try [Duley] for involuntary manslaughter because the indictment fails to charge that offense."

---

1. Duley was also convicted under a separate count of the indictment that charged assault. The assault conviction merged into the convictions for child abuse and manslaughter.

■ Although no objection to the adequacy of the indictment to charge manslaughter was made before the trial court, Duley now contends that the failure of the indictment to charge an offense deprived that court of jurisdiction. The question of jurisdiction may be raised at any time. *Pedzich v. State,* 33 Md.App. 620, 365 A.2d 567 (1976).

With respect to the manslaughter, the indictment charged:

"The Grand Jurors of the State of Maryland, in and for the body of Calvert County, does further present that MICHAEL JOSEPH DULEY, late of Calvert County aforesaid, on or between the 20th day of June in the year nineteen hundred and eighty-two and the 16th day of July in the year nineteen hundred and eighty-two, at Calvert County aforesaid, unlawfully did kill and slay MICHELLE L. DULEY, against the peace, government and dignity of the State.

Common Law"

■ There are two methods that the State may utilize in charging the offense of manslaughter: 1) under the common law, or 2) the statutory short form indictment set out in Md.Ann.Code art. 27, § 616. *Brown v. State,* 44 Md.App. 71, 410 A.2d 17 (1979).

The requisites for charging manslaughter at common law were articulated in *Neusbaum v. State,* 156 Md. 149, 155, 143 A. 872, 875 (1928). The Court there said:

"At common law it was essential that the indictment should show the name of the person charged, the name of the person killed, the jurisdiction within which and the time at which the homicide occurred, that it was felonious and such facts and circumstances incident to the crime as were reasonably necessary to identify it, and to enable the court to see whether a crime had been committed as charged."

■ The indictment in the instant case alleges neither that the homicide was felonious nor "the facts and circumstances incident to the crime." Because those elements are

missing, the indictment conflicts with *Neusbaum.* It is not defective because of the failure to aver that it was "feloniously" committed inasmuch as Md.Rule 711 d declares that the use of the word "feloniously" is no longer required in a charging document. The indictment, however, must, by common law standards, fall because it fails to apprise the accused of "the facts and circumstances incident to the crime." 156 Md. at 155, 143 A. at 875.

That the indictment is not sufficient at common law does not mean that it is insufficient for all purposes.

Md.Ann.Code art. 27, § 616 provides:

"In any indictment for murder or manslaughter, or for being an accessory thereto, it shall not be necessary to set forth the manner or means of death. It shall be sufficient to use a formula substantially to the following effect: *'That A.B., on the ..... day of ..... nineteen hundred and ....., at the county aforesaid, feloniously (wilfully and of deliberately premeditated malice aforethought) did kill (and murder) C.D. against the peace, government and dignity of the State.'"* (Emphasis supplied.)

The indictment in the instant case substantially tracked the statutorily suggested form. Hence, the indictment properly charged manslaughter. We add that the term "Common Law," appearing at the foot of the count charging manslaughter, refers to the common law offense of manslaughter and not to the manner in which it is charged.

## II.

"The trial judge erred by allowing an expert pathologist to testify as to a battering parent 'profile.'"

The State's witness, Dr. Brian D. Blackbourne, qualified as an expert in the fields of forensic and anatomical pathology.

The record reveals the following significant happenings with respect to the direct examination of Dr. Blackbourne:

"[Mr. Sengstack, State's Attorney]: All right. Can you tell me whether or not in your research of the matter, have you had occasion to determine whether or not a certain type of individual might be more prone to commit this type of [child] abuse?

MR. CUMBERLAND [Defense Counsel]: Objection.

THE COURT: Overruled. You may answer.

A. [Dr. Blackbourne]: Yes. There is sort of a profile of common facts in a series of cases.

Q. [Mr. Sengstack]: All right. Can you tell me what that profile consists of?

MR. CUMBERLAND: Objection.

THE COURT: Overruled.

A. [Dr. Blackbourne]: The persons involved in the Battered Child Syndrome often are young, somewhat immature, unable to really handle their emotions in a socially acceptable fashion. Frequently they are in a stressful situation, either economic, domestic stresses on them, and subject to sort of flying off when certain added stress is presented. They sometimes have been victims of quite harsh punishment themselves as they were growing up, is sort of a pattern which they fall back into."

During its argument for a verdict of guilty on the child abuse charge, the State referred to Dr. Blackbourne's testimony by asserting:

"Mr. Duley fits the criteria that Dr. Blackbourne indicated this type of person might be involved in child abuse. One who is young, one who feels the pressure of financial situations, one who has to babysit while the wife might be working. This is the exact type of person who is most likely to commit this type of crime."

Recently, the Court of Appeals of the State of Washington considered a similar issue to that presented in the matter *sub judice*. That court, in *State v. Maule,* 35 Wash. App. 287, 667 P.2d 96 (1983), held that it was reversible error for a trial judge to admit evidence that a majority of child abuse cases involve a male parent figure, with biological

fathers outnumbering non-biological fathers as offenders. In reversing, the appellate court said:

"In *State v. Steward,* 34 Wash.App. 221, 224, 660 P.2d 278 (1983), we held that it was reversible error to admit 'expert' testimony in a second degree murder prosecution of a babysitting boyfriend that, on the basis of the expert's experience, 'serious injuries to children were often inflicted by either live-in or babysitting boyfriends.' We consider equally prejudicial the admission of 'expert' testimony that the majority of child sexual abuse cases involve 'a male parent-figure, and of those cases that would involve a father-figure, biological parents are in the majority' in a prosecution of a defendant who is the father figure of one of the alleged victims and the father of the other. Such evidence invites a jury to conclude that because the defendant has been identified by an expert with experience in child abuse cases as a member of a group having a higher incidence of child sexual abuse, it is more likely the defendant committed the crime. Admission of this testimony was reversible error. *State v. Steward,* supra." 35 Wash.App. at ——, 667 P.2d at 99. *See also State v. Loebach,* Minn., 310 N.W.2d 58 (1981).

■ We are persuaded by *Maule's* reasoning, and we hold that the admission into evidence of Dr. Blackbourne's "child battering profile" was error. Such evidence is totally irrelevant because it does not tend to prove that Duley committed the acts of abuse attributed to him. The evidence had no probative value with respect to Duley's culpability. J. Wigmore, *A Student's Textbook on the Law of Evidence,* 36 (1935). *Brown v. State,* 29 Md.App. 1, 349 A.2d 359 (1975). At best, Dr. Blackbourne's testimony tended to associate Duley with a group of persons who, in the doctor's opinion, are often responsible for child abuse. That type of evidence is no different than allowing an expert to testify that most homicides are committed by men. From that point of reference, only a dolt would not include Duley within the scope of the comment.

We are aware that in *Grant v. State,* 55 Md.App. 1, 461 A.2d 524 (1983), this Court sanctioned the testimony of a Maryland State Trooper, trained in drug traffic interception, as to the "drug carrier profile." There, however, we were dealing with "probable cause" to stop an alleged courier. *Grant* was concerned with the mechanizations of a clandestine, sophisticated, abstruse drug trafficking operation. Judge Moylan, for the Court, said:

"In assisting the jury to understand the character:'stics of the drug traffic throughout the country and to appraise accurately the value of the seized cocaine, . . . [the Trooper's testimony] served a valuable function in the search for truth." 55 Md.App. at 29, 461 A.2d at 538.

The law of Maryland is that the,

". . . admissibility of expert testimony is a matter largely within the discretion of the trial court, and its action in admitting or excluding such testimony will seldom constitute a ground for reversal." *Raithel v. State,* 280 Md. 291, 301, 372 A.2d 1069 (1977); *Grant v. State,* 55 Md.App. at 29, 461 A.2d at 538.

*See also Winkles v. State,* 40 Md.App. 616, 622–23, 392 A.2d 1173 (1978).

The only thing on record relative to any expertise Dr. Blackbourne might possess as to the "battered child parent" is contained in the simple question by the state's attorney to the doctor:

"Can you tell me whether or not in your research of the matter, have you had occasion to determine whether or not a certain type of individual might be more prone to commit this abuse?"

The answer to the question, as we have seen above, was, "Yes. There is sort of a profile of common factors in a series of cases." Other than that single question and response, there is not one word of testimony showing how, when, or where the doctor, a pathologist, acquired his expertise on the profile of the battered child's parent, nor was

there any exploration into the extent or composition of the research performed by Dr. Blackbourne.

Under the particular circumstances of this case, we deem that the trial judge should not have allowed the testimony relating to the profile of a battered child's parent.

■ That the trial judge erred in admitting Dr. Blackbourne's testimony does not *ipso facto* require that we reverse Duley's convictions. Error which is "harmless" does not warrant reversal. *Dorsey v. State,* 276 Md. 638, 350 A.2d 665 (1976). The standard to be applied in deciding whether error is "harmless" was stated by Judge O'Donnell in *Dorsey:*

"[W]hen an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed 'harmless' and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of—whether erroneously admitted or excluded—may have contributed to the rendition of the guilty verdict." 276 Md. at 659, 350 A.2d at 678.

*See also Cox v. State,* 51 Md.App. 271, 443 A.2d 607 (1982).

■ From our review of the record, we declare a belief, beyond a reasonable doubt, that the error did not contribute to or influence the judge's verdict. Independent of the so-called "profile," there was sufficient evidence to support the convictions of child abuse and manslaughter. Moreover, Dr. Blackbourne's testimony concerning the battering parent profile was so vague that it provided little, if any, information upon which the trial judge could have relied to determine Duley's culpability. As we have pointed out, whether, in Dr. Blackbourne's words, "the persons involved in the Battering Child Syndrome often are young, somewhat immature, unable to really handle their emotions in a socially acceptable fashion," was *irrelevant* in this case. Irrelevant evidence may or may not prejudice the defendant, depend-

ing on the attendant circumstances. There was no testimony admitted into evidence which established that Duley possessed the fuzzy criteria testified to by Dr. Blackbourne. The record does not reveal that Duley was, at the time of the death of his daughter, immature, unable to control his emotions in a socially acceptable fashion, or under an undue amount of stress. If the trial judge believed the purported battering parent profile, it does not necessarily follow that he would be influenced against Duley because of the lack of evidence that Duley fit the profile.

Although the state's attorney argued in his closing argument that, "Mr. Duley fits the criteria that Dr. Blackbourne indicated . . . might be involved in child abuse," we perceive nothing in the record that supports the allegation. Furthermore, it does not appear from the transcript that the trial judge was influenced by either Dr. Blackbourne's battering parent profile or by the state's attorney's reference to it. A review of the judge's comments on the evidence demonstrates beyond a reasonable doubt that he based his conclusions on the statement of the accused and upon the testimony of five physicians.

Michelle L. Duley was born on May 1, 1982. On July 13, 1982, she experienced respiratory problems and was taken to the hospital. She died on July 16, 1982. Dr. Rak Woon Kim, who performed the autopsy, determined that the cause of death was a recent subdural hematoma (blood clot in the cranium) associated with hypoxic encephalomalacia (lack of oxygen to the brain). Dr. Kim's examination also disclosed multiple rib fractures of varying ages on Michelle's body. He concluded that Michelle was a victim of the "Battered Child Syndrome," which is indicated by "unreasonable injuries to the body" of the child, such as fractures and internal hemorrage.

Four other doctors who examined Michelle concurred in the opinion that she was a battered child.

In the opinion of Dr. Alan Fields, who examined her at Children's Hospital in the District of Columbia, Michelle's

subdural hematoma resulted from her being shaken with force in excess of what "any prudent parent would undertake." Dr. Fields stated that Michelle's rib fractures were caused by excessive force and could not have been self imposed.

Duley's July 20, 1982 statement to Sergeant Robert Hampshire of the Maryland State Police was received into evidence. Duley recalled his actions of July 13, 1982:

"My brother Johnny had stopped by. I had the baby on my chest. She had just been fed and everything and I was rocking her to sleep. He only stayed for a few minutes and then he left and then I laid the baby down on the floor, on a pillow on her stomach. A few minutes had gone by or so, and I happened to look down and she was turning colors, like a kind of a blue white or blue gray like color, and I just kind of watched her for a couple of seconds to see if it was just my eyes or what. I took and I slapped her on the back real hard and then I flipped her over by her arm and I slapped her on the chest a couple of times. I picked her up and shook her a litle real hard, still wasn't breathing, so I took and I blew in her mouth, mouth to mouth, and she come out of it. She started breathing after I did that. So then I laid her down on the floor back on the pillow there and a couple minutes or so had gone by, a little while, I don't know how long it was. It looked like she was sleeping for a while and when I looked down there again at her and she was turning colors again. So then I, I picked her, I slapped her on the stomach again, I picked her up again and shook her a little. She wouldn't come out of it, so I, then I grabbed her so her head would go back, so I could give her mouth to mouth. She wouldn't come out of it this time. I shook her and I slapped her and pushed on her chest some more, slapping her in her face, and blew in her mouth to mouth again, and she just wouldn't come out of it. So then I grabbed her and I ran over to my neighbor's and called an ambulance and they came."

Duley also stated that when he shook Michelle he did not use anything to support her neck and head.

Commenting on the evidence, the trial judge said:

"[W]e conclude that the State has proven beyond a doubt that this child was battered and that the acts which caused this death were criminally negligent.

We have no difficulty with the proof of a corpus delicti in this case, because *overwhelming* evidence indicates that that is what happened. The manner in which the medical testimony shows these injuries were caused indicates that they were the result of substantial force, force not remotely approaching anything which would be applied in the exercise of judgment, good or bad, to a child of this age." (Emphasis supplied.)

We think it clear that the judge was not influenced by Dr. Blackbourne's statement. The judge concluded, based on the "overwhelming" testimony of the five physicians, that Michelle was a battered child.

Having determined the cause of death, the trial judge turned "to the consideration of whether ... the ... evidence satisfie[d] [him, as factfinder] beyond a reasonable doubt that the Defendant ... inflicted these injuries."

The best evidence of the force applied to Michelle by Duley in this case was contained in his own statement concerning his actions on July 13, 1982, which we have quoted previously. The statement that, "I slapped her on the back real hard ...[;] ... shook her ... real hard ...[;] ... slapped her on the stomach ...[;] ... shook her and I slapped her and pushed on her chest some more, slapping her in her face ..." is consistent with the expert medical testimony that Michelle died from fractures which could not have been self imposed, and from being shaken with excessive force.

Duley's statement, when coupled with the medical testimony, is sufficient to establish his criminal agency. That medical testimony showed that the bruises and fractures of Michelle's body had been inflicted over a period of time, and

it cast serious doubt on Duley's assertion that the force he administered to the infant was to revive her. Dr. Duang Silpasuvan and Dr. Nancy D. Briggs examined Michelle on July 13, 1982, the day she was admitted to Calvert County Memorial Hospital. They both testified that they observed bruises on Michelle's body which must have been inflicted not less than three days earlier. Dr. Fields also examined Michelle on July 13, 1982. His examination revealed "at least two [rib] fractures, perhaps more, one of which was with callus formation, which puts it a minimum of over a week old, one of which was fresh." As a result of the autopsy, Dr. Kim determined that Michelle sustained three rib fractures approximately two to four weeks prior to her death. Significantly, *there is no evidence that anyone else inflicted any physical injuries to the child.* The strong circumstantial evidence supports the conclusion that Duley was the perpetrator of the crimes.

Dr. A. Clark Holmes, a family practitioner, examined Michelle Duley on June 19, 1982, when she was approximately six weeks old, and found her to be a normal, healthy child without either fractures or abrasions. At about the same time, Roxanne Duley, Michelle's mother, returned to work after an absence of six weeks because of the child's birth. The appellant provided daytime care for the child.

After the visit to Dr. Holmes on June 19, 1982, and continuing during the period when appellant had primary custody of Michelle, various marks and abrasions began to appear on her body. Terry Watson, Michelle's grandmother, babysat on June 29, 1982, and at that time she observed a bruise on the infant's leg. When Mrs. Watson pointed out the bruise to her daughter, Roxanne replied, "The next one I see, I will take her to a doctor." Mrs. Watson next babysat for Michelle on July 4, 1982. During that visit she observed a bruise on the right side of Michelle's back. Subsequently, on July 9, 1982, Mrs. Watson observed a bruise on Michelle's jaw.

In referring to that evidence, the judge remarked:

"Now, we think it is an inescapable inference . . . that during the time the mother was either in control or in joint control with the father, this child had no problems. But as soon as the mother goes back to work, the problems appear. And within less than a month, the baby is dead, literally from being beaten and shaken to death. We think here the evidence of amount of force necessary and the method of application are circumstances which together with the fact that the child was in the father's control during the daytime and in apparently his exclusive control during the daytime, indicate to the Court that it was he, as opposed to the mother, the only other person who might have inflicted these injuries, who inflicted them."

We conclude that the inadmissible statement of Dr. Blackbourne did not contribute to the judge's determination that Duley was the criminal agent responsible for Michelle's death.

### III.

"The evidence was insufficient to sustain the conviction for child abuse . . . [and manslaughter]."

What we have said above in holding that the admission of Dr. Blackbourne's statement was harmless error largely obviates further discussion of this issue.

The action prohibited by Md.Ann.Code art. 27, § 35A is the infliction of injury to a child as a result of cruel or inhumane or malicious acts. The word "inhuman," a variant of "inhumane," is defined as "lacking the qualities of mercy, pity, kindness, or tenderness," Webster's *Third New International Dictionary.* *See also Bowers v. State,* 283 Md. 115, 125, 389 A.2d 341, 347 (1978). The record supports a finding that Duley hit his infant baby hard enough to break her ribs and shook her hard enough to rupture the blood vessels in her brain. From such a finding the trial judge could conclude beyond a reasonable doubt that Duley's actions were lacking in the qualities of mercy, pity, kindness or tenderness.

Involuntary manslaughter may consist of the doing of a lawful act in a grossly negligent manner. *Neusbaum v. State,* 156 Md. 149, 143 A. 872 (1928); *Rolfes v. State,* 10 Md.App. 204, 268 A.2d 795 (1970). The evidence shows that Duley exercised a reckless disregard for human life and thus sustains the manslaughter conviction.

JUDGMENTS AFFIRMED. COSTS TO BE PAID BY APPELLANT.