502 A.2d 496

**Larry Andre BRANCH**

v.

**STATE of Maryland.**

**No. 53, Sept. Term, 1985.**

Court of Appeals of Maryland.

Jan. 9, 1986.

Sherrie B. Glasser, Asst. Public Defender (Alan H. Murrell, Public Defender, on brief), Baltimore, for appellant.

Valerie W. Loftin, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen., on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, RODOWSKY, COUCH and McAULIFFE, JJ.

SMITH, Judge.

Because of a substantial variation between the description initially given of a robber and that of the actual description of the defendant it is here contended that there was insufficient evidence to convict. We shall hold to the contrary. Hence, we shall affirm the judgment of the Court of Special Appeals.

Beatrice Mudge was robbed by two black males at approximately 7:15 a.m. on April 14, 1983, while enroute to her employment at The Johns Hopkins Hospital. She immediately reported the incident to security at the hospital who called the Baltimore City Police. At approximately 8:30 a.m. she advised the police that the individual who held the gun on her was a black male, approximately 5 feet 7 inches tall, 15 to 16 years of age, weighing 110–125 pounds, wearing a dark jacket, and carrying a silver handgun.

Miss Mudge was later interviewed by yet another police officer, unacquainted with the description given by her earlier, who asked her to look through two books containing a total of approximately 600 photographs. She was unable to identify any of those photographs as being of her assailant. Thereupon the police officer showed her three additional photographs. At about 10:45 a.m. she identified a picture of Larry Andre Branch as the individual who held the gun on her.[1] This photograph had on it no indication of height and weight.

---

1. No contention is made here that this photo identification was in any way suggestive.

Branch at the time in question was 19 years of age, 6 feet 3 inches tall, and weighed 185 pounds. Miss Mudge is approximately 5 feet 6 inches in height. Branch is said to have two missing front teeth. Miss Mudge did not note such a feature. The photograph which she selected does not show missing front teeth.

At trial Miss Mudge testified that there was no question in her mind when she saw Branch's photograph that he was the individual that had robbed her and that this was the same individual she saw as the defendant in the trial court. She said her assailant was taller than she, that they "were on a slant, too." In court she was asked on cross-examination if she remembered saying that her assailant weighed 110 to 125 pounds and was 15 to 16 years of age. The record then is:

"A   Well, wait—

"Q   Go on. Finish. Excuse me.

"A   When somebody asked me how much did he weigh I said oh, God, are you asking me that? I don't know how much people—I mean, you think weight is—I'm not sure how much people weigh.

"Q   I understand.

"A   I mean, weight is—I would think you'd weigh something and it would probably be completely different.

"Q   Just don't say. But, you do recall giving a weight description, is that right?

"A   Yeah."

On the issue of teeth Miss Mudge said she "didn't see anything specifically about his teeth."

At trial she was pressed on the issue of height and whether she had given a wrong description. The record then is:

"THE WITNESS: Well, all that—you know, all I can remember back then is that he was tall. I looked at his face and he was taller than I am. Now, was he five foot seven or five foot nine? I wish I had my tape measure with me because I—

"MR. PURPURA [Counsel for Branch]: I wish you did, too.

"THE WITNESS: How much taller was he and how much—you know, if I had my heels I could have been, you know, just a little taller."

On cross-examination of Miss Mudge the issue of the height of Branch was before the jury in the following manner:

"Q . And, so you basically know the difference between someone who is five foot seven and someone who is six foot three or four, is that correct?

"A   Yes, I do.

"MR. PURPURA: At this time I would like to have the publication before the Jury of my client standing next to Miss Mudge.

"THE COURT: Well, I don't know how close you can get.

"MR. PURPURA: Stand up.

"THE COURT: Do you want to stand up to just where you are by the witness?

"MR. PURPURA: So that the Jury can see also—

"MR. TICKNOR: Hold it.

"MR. PURPURA: Okay.  Fine.  Could you just turn towards her, please?

"THE WITNESS: That's him.

"BY MR. PURPURA:

"Q   Now, Miss Mudge, when you turned and you said that's the man in the Courtroom you pointed right to Mr. Branch, is that right?

"A   Uh-huh.  Yes.

"Q   And, you were sure you didn't point to anybody else, right?

"A   No.

"Q   As a matter of fact, you didn't look around the Courtroom to see if anyone else could possibly be the person, is that right?

"A  Well, I looked at him when I came in. I sat down here. I mean, he was here all day. I've seen him. I mean, looking at him—"

The above demonstration was immediately followed up on redirect examination:

"Q  Having just stood very close to the Defendant in this case is his height consistent with the person that robbed you?

"A  You're asking me—

"Q  Is his height consistent with the person that robbed you?

"A  Yes. Yeah. Yes.

"Q  Now, it doesn't surprise you that he's tall or anything like that?

"A  No."

Branch claimed to have an alibi which was corroborated by his girlfriend, his aunt, and a ticket from a pawn shop for the day in question for a television set which he claimed to have pawned for his aunt at her request.

Branch appealed his conviction to the Court of Special Appeals. The intermediate appellate court affirmed in an unreported opinion (No. 351, September Term, 1984, decided Dec. 4, 1984). We granted a writ of certiorari to address the issue framed in the petition:

"Whether the Court of Special Appeals erred in affirming a blatant case of misidentification in that the victim had described the robber as being 5'7", 110–125 pounds, 15–16 years old, with no unusual facial features—when the evidence revealed that Petitioner, convicted of this crime, was 6'3" tall, 185 pounds, 21 years old, with missing front teeth." [2]

We point out that *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), and its holding that an accused "is entitled to habeas corpus relief if it is found

---

**2.** At oral argument counsel for Branch conceded that the age of Branch at the time of the incident was 19.

that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt," 443 U.S. at 324, 99 S.Ct. at 2791–92, in no way changed the standard in effect in Maryland. In *Williams and McClelland v. State,* 5 Md.App. 450, 247 A.2d 731 (1968), *cert. denied,* 252 Md. 731, 734 (1969), Judge Orth carefully reviewed for the Court of Special Appeals a number of the prior cases of this Court such as *Gibson v. State,* 238 Md. 414, 209 A.2d 242 (1965); *Shelton v. State,* 198 Md. 405, 84 A.2d 76 (1951); *Edwards v. State,* 198 Md. 132, 81 A.2d 631, 83 A.2d 578 (1951); and *Lambert v. State,* 196 Md. 57, 75 A.2d 327 (1950). All of those cases arose subsequent to the constitutional amendment now embodied in Maryland Declaration of Rights, Art. 23 which provides that a trial court "may pass upon the sufficiency of the evidence to sustain a conviction," and, hence, that this was open to appellate review. Judge Orth then said for the Court of Special Appeals:

"Once the question of the sufficiency of the evidence is properly before us, we believe that the criteria used to determine the question is the same, be the verdict rendered by the court or a jury. Whether the test applicable to jury cases is stated in the affirmative—the judgment will be affirmed if there is any relevant evidence before the jury to sustain a conviction—or in the negative—to overturn a judgment there must be no legally sufficient evidence on which the defendant could be found guilty beyond a reasonable doubt—it is inherent that to be sufficient in law to justify the conviction within the intent of [Maryland Code (1957, 1967 Repl.Vol., 1967 Cum. Supp.)] Art. 27, § 593 the admissible evidence adduced must show directly or *support a rational inference of the facts to be proved,* from which the jury could fairly be convinced, beyond a reasonable doubt, of the defendant's guilt of the offense charged." 5 Md.App. at 458–59, 247 A.2d at 737 (emphasis added).

Applying this standard under *Jackson,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, Chief Judge Murphy said for the

Court in *State v. Rusk*, 289 Md. 230, 240, 424 A.2d 720, 725 (1981), "[T]he applicable standard is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' 443 U.S. at 319 [99 S.Ct. at 2789] (emphasis in original)." *Accord Tichnell v. State*, 287 Md. 695, 717, 415 A.2d 830, 842 (1980).[3]

This Court said in *Walters v. State*, 242 Md. 235, 218 A.2d 678 (1966):

"Identification by the victim is ample evidence to sustain a conviction. *Davis v. Warden*, 235 Md. 637, 201 A.2d 672 (1964); *Rakes v. State*, 227 Md. 172, 175 A.2d 579 (1961) and cases cited therein. The testimony of a victim, unlike that of an accomplice, needs no corroboration. *Gregoire v. State*, 211 Md. 514, 128 A.2d 243 (1957); *Basoff v. State*, 208 Md. 643, 119 A.2d 917 (1956). The testimony of Mrs. Mollinary was legally sufficient to convict." 242 Md. at 237–38, 218 A.2d at 680.

For a more recent application of the rule see *Mobley and King v. State*, 270 Md. 76, 89, 310 A.2d 803, 811 (1973), *cert. denied*, 416 U.S. 975, 94 S.Ct. 2003, 40 L.Ed.2d 564 (1974); *Kirby v. State*, 48 Md.App. 205, 211, 426 A.2d 423, 427, *cert. denied*, 291 Md. 777 (1981).

No useful purpose would be served by reviewing the numerous cases dealing with identification cited by both sides. In the final analysis the responsibility is ours to determine whether there was sufficient evidence to permit a rational trier of fact to find beyond a reasonable doubt there was sufficient evidence to establish the essential elements of the crime and that Branch was the criminal

---

**3.** We dropped a footnote in *Bedford v. State*, 293 Md. 172, 176, 443 A.2d 78, 80 (1982), in which we quoted from L. Hochheimer, *Criminal Law* § 157 (2d ed.1904), a work much used by Maryland attorneys, and said we regarded it as "being basically in accord with that enunciated by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)."

agent. The issue of credibility, of course, is one for the trier of fact.

Admittedly we have here a substantial discrepancy between the description given by the victim of the crime almost immediately after the incident and the actual description of the accused. We view this as going to the weight and not to the sufficiency of the evidence. It was while the facts were still fresh in the victim's mind, approximately three and a half hours after the incident, that she selected a picture of the accused as being of her assailant. In the courtroom she positively identified the accused as being the perpetrator of the robbery. We hold that this was enough for a rational trier of fact to conclude beyond a reasonable doubt that Branch was the culprit.

JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.

ELDRIDGE, Judge, dissenting:

The Court today relentlessly applies the rule that testimony of a single eyewitness identifying the accused as the perpetrator of the crime is sufficient evidence to permit a rational judge or jury to find guilt beyond a reasonable doubt. In light of the circumstances of this case, I dissent.

On April 14, 1983, at approximately 7:00 a.m., Beatrice Mudge was robbed by two black males while on her way to work in Baltimore. One of the assailants pointed a gun at Mudge, told her not to move, and grabbed her purse. The two then fled. The entire incident lasted approximately five minutes.

Later on the day of the incident, Mudge described the gunman to police as approximately 15 to 16 years old, 5'7" tall, between 110 and 125 pounds, wearing a dark jacket, and carrying a silver handgun. According to Mudge, he was also wearing a stocking on his head which covered his ears but not his face. Mudge mentioned no distinctive facial features. Mudge could give no description of the other assailant. She was shown several books containing

about 500 photographs but did not select any. A police officer then took three photographs from his pocket and showed them to Mudge. She picked one of the three as a photograph of the gunman. The police investigation ceased once this photo identification was made.

Solely on the basis of the photo identification, Larry Andre Branch was arrested and charged with robbery with a deadly weapon and use of a handgun in the commission of a crime of violence. Mr. Branch was 19 years old, 6'3" tall, and weighed 185 pounds. On January 30, 1984, at the jury trial in the Circuit Court for Baltimore City, the State presented two witnesses, Mudge and one police officer. Mudge testified to the events of April 14, 1983, and identified Branch in court as the one carrying the gun on that day. On cross-examination, she acknowledged the details of the original description which she had given to police and stated her own height as 5'6". The second state witness testified only to the circumstances of the photo identification which Mudge had made. The prosecution produced no other evidence.

For the defense, Sharon Vincent, a woman with whom the defendant was living at the time of the crime, testified that she was in bed with the defendant until 10:00 a.m. on the morning of the crime. In response to questioning as to Branch's physical characteristics, Vincent stated that he was 6'3" or 6'4" tall, and had been missing two front teeth since November 1982. The defendant's aunt, Pauline Wright, testified that at approximately 10:00 a.m. she arrived at the house where the defendant was living and found him in his night clothing in the room he shared with Sharon Vincent. Wright testified that she needed Branch's help that morning to carry a television set to a pawn shop. She stated that, after dressing, Branch helped her take the set to the shop. The defense introduced the pawn ticket, dated April 14, 1983, into evidence. The defendant recounted the same story as his alibi witnesses and denied participating in the robbery. He also described himself as 6'3" tall, 185 pounds, and 19 years of age.

On the sole basis of Mudge's identification, the jury convicted Branch of both charges. Branch appealed to the Court of Special Appeals which affirmed the convictions in an unreported opinion. The appellate court, although recognizing "[t]hat an eminently reasonable jury could have harbored serious doubts as to [Branch's] guilt," applied the rule that "the positive identification of a single eyewitness, if believed by the trier of fact, is ample evidence to sustain a conviction."

In light of the testimony presented, it is difficult to conclude that a rational trier of fact could have found, beyond a reasonable doubt, that Branch perpetrated the crime described here. The evidence simply falls short of that required to support a conviction under the constitutional standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). There the Supreme Court held that an accused "is entitled to ... relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." 443 U.S. at 324, 99 S.Ct. at 2791–92. The same standard has been applied in Maryland courts since 1950. *See Bedford v. State*, 293 Md. 172, 174–176, 443 A.2d 78 (1982).

In examining the testimony in particular cases to determine whether there was sufficient evidence to support a verdict, this Court has often been suspicious of certain inherently unreliable forms of testimony. Thus a verdict founded on testimony that is "too inconclusive, contradictory, and uncertain to be the basis of a legal conclusion," requires reversal. *Slacum v. Jolley*, 153 Md. 343, 351, 138 A. 244 (1927). In *Slacum*, the Court reversed a judgment for the plaintiff and ordered judgment for the defendant because, *inter alia*, the plaintiff's medical expert's testimony as to the cause of death was contradictory.

In a case concerning the highway collision of the Governor's motorcade with a bakery truck, the Court observed: "These accidents generally occur so quickly that the recol-

lection of what happens, even to the participants, is not always accurate, and the evidence often unreliable." *Fid. & Guar. Co. v. Baking Co.*, 172 Md. 24, 28, 190 A. 768 (1937). The Court rejected the plaintiff's contradictory evidence that the motorcade had a green light, *id.* at 33, 190 A. 768, and affirmed the trial court's judgment that there was insufficient evidence against the defendant Baking Company. In *Oberfeld v. Eilers*, 171 Md. 332, 189 A. 203 (1937), another collision case, the Court reversed a judgment for the plaintiff. The case hinged on which truck crossed the center line of the road. The Court rejected the plaintiff's testimony as too uncertain, because his distance estimates were inconsistent with the width of his truck and the width of the pavement. 171 Md. at 336–337, 189 A. 203. *See also, Kaufman v. Balto. Transit Co.*, 197 Md. 141, 78 A.2d 464 (1951); *Eisenhower v. Balto. Transit Co.*, 190 Md. 528, 59 A.2d 313 (1948). In *Butler v. Reed-Avery Co.*, 186 Md. 686, 693, 48 A.2d 436 (1946), the Court affirmed a directed verdict for the defendant because the plaintiff's testimony was "too confused, indistinct, uncertain and contradictory" to prove that he suffered burns by falling into defendant's chemical effluent.

The above-cited opinions show that, in civil cases at least, this Court has generally been willing to take notice of the inherent unreliability of certain forms of eyewitness testimony, and to conclude in some cases that a verdict cannot be based on such testimony.[1] For example, the Court recognized that the speed, surprise and shock of an auto accident may leave the people involved unable to recall the state of traffic signals or precisely to describe the position of vehicles. *Fid. & Guar. Co. v. Baking Co., supra*, 172 Md. at 28, 190 A. 768.

---

[1]. In a criminal case, *Kucharczyk v. State*, 235 Md. 334, 201 A.2d 683 (1964), this Court held that the contradictory testimony of a mentally deficient sixteen year old was insufficient to establish the facts required for a sodomy conviction.

The same phenomena attend a fleeting street robbery. There is no reason to assume that the victim of a mugging can always reliably identify the assailant. In fact, the inherent unreliability of eyewitness testimony has been well documented.[2]

The Supreme Court noted in *United States v. Wade*, 388 U.S. 218, 228, 87 S.Ct. 1926, 1933, 18 L.Ed.2d 1149 (1967), that

> "[t]he vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification. Mr. Justice Frankfurter once said: 'What is the worth of identification testimony even when uncontradicted? The identification of strangers is proverbially untrustworthy. The hazards of such testimony are established by a formidable number of instances in the records of English and American trials. These instances are recent—not due to the brutalities of ancient criminal procedure.' "

In an analysis of the unreliability of eyewitness identification, Judge Bazelon, dissenting in *United States v. Butler*, 636 F.2d 727, 732 (D.C.Cir.1980), *cert. denied*, 451 U.S. 1019, 101 S.Ct. 3010, 69 L.Ed.2d 392 (1981), commented:

> "There is now a wealth of literature demonstrating the tendency of [eyewitness testimony] to be inaccurate.... [M]any experts have concluded that convictions based solely on 'one eyewitness' identifications represent 'con-

---

**2.** *See generally* E. Loftus, *Eyewitness Testimony* (1979); N. Sobel, *Eyewitness Identification* (1984); P. Wall, *Eye-Witness Identification in Criminal Cases* (1965); A. Yarmey, *The Psychology of Eye-Witness Testimony* (1979); Buckhout, *Eyewitness Testimony*, Scientific American, Dec. 1974, at 23; Jonakait, *Reliable Identification: Could the Supreme Court Tell in Manson v. Brathwaite?* 52 Colo.L.Rev. 511 (1981); Levine & Tapp, *The Psychology of Criminal Identification: The Gap from Wade to Kirby*, 121 U.Pa.L.Rev. 1079 (1973); McGowan, *Constitutional Interpretation and Criminal Identification*, 12 Wm. & Mary L.Rev. 235 (1970); Comment, *Expert Testimony on Eyewitness Perception*, 82 Dick.L.Rev. 465 (1978); Note, *Did Your Eyes Deceive You? Expert Psychological Testimony on the Unreliability of Eyewitness Identification*, 29 Stan.L.Rev. 969 (1977).

ceivably the greatest single threat to the achievement of our ideal that no innocent man shall be punished.' "

Generally in cases where this Court has sustained convictions involving single eyewitness identification testimony, there have been other indicia of the reliability of the testimony and the resulting conviction. In *Mobley and King v. State,* 270 Md. 76, 89, 310 A.2d 803, 811 (1973), *cert. denied,* 416 U.S. 975, 94 S.Ct. 2003, 40 L.Ed.2d 564 (1974), the Court rejected King's contention that there was insufficient evidence to support his conviction for armed robbery, citing the single eyewitness rule. There, however, the reliability of the identification was enhanced by the fact that the police apprehended King minutes after the crime with cash and a weapon, and with clothes and a car described by the eyewitness.

In *Wilkins v. State,* 239 Md. 692, 211 A.2d 308 (1965), the witness knew the man he identified; in addition, the man who was identified admitted to being at the scene of the robbery at the time it occurred and to eluding arrest for three days thereafter. In *Tucker v. State,* 237 Md. 422, 206 A.2d 691 (1965), and *Davis v. Warden,* 235 Md. 637, 201 A.2d 672 (1964), there were two eyewitnesses whose testimony dovetailed. *See also Bedford v. State, supra.* In *Rakes v. State,* 227 Md. 172, 175 A.2d 579 (1961), the eyewitness knew his assailants. *But cf. Walters v. State,* 242 Md. 235, 218 A.2d 678 (1966); *Coates v. State,* 232 Md. 72, 191 A.2d 579 (1963).

Several cases, dealing with situations involving substantial discrepancies between the description furnished by an eyewitness to police and the actual appearance of the person convicted on the basis of that eyewitness's testimony, have reversed the convictions in part because of those discrepancies. *See, e.g., People v. Martin,* 2 Cal.3d 822, 87 Cal.Rptr. 709, 471 P.2d 29 (1970); *Crawley v. United States,* 320 A.2d 309 (D.C.App.1974); *People v. Ash,* 102 Ill.2d 485, 82 Ill.Dec. 373, 468 N.E.2d 1153 (1984); *State v. Gluff,* 285 Minn. 148, 172 N.W.2d 63 (1969). *See also*

*Jackson v. Fogg,* 589 F.2d 108 (2d Cir.1978); *United States v. Russell,* 532 F.2d 1063 (6th Cir.1976); *Clemons v. United States,* 408 F.2d 1230, 1242 (D.C.Cir.1968), *cert. denied,* 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969); *United States v. Levi,* 405 F.2d 380 (4th Cir.1968).

In a case such as this, where the sole evidence was the victim's identification testimony, where that testimony followed an extremely suggestive photo identification procedure, where the testimony was uncorroborated, where the victim's opportunity to observe and remember the appearance of her assailant was brief and fraught with fear, where her "description" depicted an individual six inches shorter, sixty pounds lighter, several years younger and omitted the telling detail of missing front teeth, and where the defendant's witnesses and documentary evidence corroborated his alibi, I would hold the single eyewitness identification testimony insufficient to convict.

Judge COLE has authorized me to state that he concurs with the views expressed herein.