522 A.2d 1364

**Richard Ernest SLOAN, Jr.**

v.

**STATE of Maryland.**

**No. 13 Sept. Term, 1986.**

Court of Special Appeals of Maryland.

April 8, 1987.

Michael R. Malloy, Asst. Public Defender (Alan H. Murrell, Public Defender, on the brief), Baltimore, for appellant.

Valerie W. Loftin, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen., Baltimore, Warren B. Duckett, Jr., State's Atty., and Cynthia Ferris, Asst. State's Atty., for Anne Arundel County on the brief, Annapolis), for appellee.

Argued before GARRITY, KARWACKI, and ROBERT M. BELL, JJ.

ROBERT M. BELL, Judge.

Richard Ernest Sloan, Jr., appellant, who was charged with the murder, child abuse, and battery of a two-year-old boy, was tried by a jury in the Circuit Court for Kent County.[1] He was convicted of manslaughter, child abuse, and battery and sentenced to a total of 15 years imprisonment. From the judgments thus entered, appellant appeals, presenting the following questions:

1. Whether the trial court erred in denying appellant's motion for judgment of acquittal.

2. Whether the trial court erred by allowing a State's witness to testify concerning "classic indicators" of a child abuser.

3. Whether the trial court erred by admitting the testimony of a social worker concerning statements that the appellant had related to her.

4. Whether the trial court erred in denying the appellant's motion to exclude the testimony of Timothy Harrison.

5. Whether the trial court erred in admitting rebuttal evidence to impeach the appellant's testimony.

6. Whether the trial court erred in refusing to allow the appellant to call two witnesses whose names had not been included on the witness list submitted prior to trial.

7. Whether the sentence should be vacated.

We answer questions 2 and 3 in the affirmative and reverse. Nevertheless, we address, as we must, the sufficiency of the evidence. *See Bloodsworth, v. State,* 307 Md. 164, 167, 512 A.2d 1056 (1986).

---

1. This case was removed to Kent Court from Anne Arundel County April 22, 1985.

Matthew Harrison, the victim, was brought to the Johns Hopkins Pediatric Intensive Care Unit on December 24, 1984. At that time, he was in a deep coma, unable to breathe on his own, and it was discovered that he exhibited signs of having been physically and sexually abused. Matthew died on December 28, 1984. The Assistant State Medical Examiner determined that the cause of death was swelling of the brain due to a blunt injury or trauma to the head.

At trial, the State sought to prove that the victim had been physically and sexually abused, that the physical abuse caused the brain swelling, hence, the victim's death, and that appellant was the criminal agent. The testimony of the attending physicians established that, upon admission, the victim was severely critically ill and in danger of imminent brain death. That testimony, along with that of the investigating officer, noted that "physical signs of [the victim] being beaten" were observed on the victim's body and that his anus had been injured in such a manner as to be "highly suggestive that the child had been sexually molested." [2] A CAT scan revealed the presence of cerebral edema, brain swelling, and bruises on the victim's left and right frontal-temporal area.

The testimony of Timothy Harrison, the victim's brother corroborated that the victim had been physically abused and further tended to prove that appellant was responsible for the abuse. He testified that appellant began to care for the victim, while his mother worked, shortly after August 5, 1984 and that approximately a week before Christmas, he noticed "a lot of bruises on the victim's legs, arms, and face." He described an incident, which occurred several days before the victim was admitted to the hospital. According to Timothy, the victim bit appellant's finger while appellant was "stuffing cotton" in the victim's mouth; upon

---

2. The investigating officer testified that he observed extensive bruising about the child's forehead and buttocks and "that the anus was a deep purple color and it appeared to be lacerated."

being bitten, appellant hit the victim's head up against the window ledge of the door panel of appellant's truck three times until the victim opened his mouth. Thereafter, appellant started hitting the victim in the face and struck his hand on the steering wheel. Later that day, Timothy reported seeing appellant kick his brother with the side of his foot, causing him to "just go down." He further stated that, on that occasion, appellant also slapped the victim's face.

Appellant's criminal agency was also supported by the testimony of the investigating officer, Detective Sergeant Barr, and Adrian Johnson, Assistant Director of Social Work at Johns Hopkins Hospital, a qualified expert in the field of injuries to children. Sgt. Barr testified that, after he had been advised of his rights,[3] appellant admitted inflicting some of the bruises on the victim, but denied knowledge as to how the anus had become bruised and lacerated. Appellant then told Sgt. Barr that Matthew had fallen on the floor and cut the inside of his mouth;[4] that he had attempted to stop the bleeding by stuffing the child's mouth with cotton; that later during the day when Matthew, Timothy, and he were riding in his pick-up truck on their way to a store in Annapolis, Matthew's lip again started bleeding profusely; that as he was in the process of repacking Matthew's mouth, the child locked his teeth on the appellant's index finger and would not release it; and

---

3. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

4. Sgt. Barr stated that at one point in the interview when discussing how the child's mouth was injured, he had asked appellant if he did not strike the child's face and knock a bottle of milk from his mouth. Appellant replied that after the child refused to drink from the bottle and spit it out, he put the bottle back in the child's mouth and "it was possible that his hand may have hit the child when he knocked the bottle from his mouth." According to Sgt. Barr, when the appellant was next asked if he had kicked the child, "he said no, he didn't kick the child but after the bottle fell from the child's mouth, the child fell over and probably struck his face on the floor."

that "the child's head did hit the car door more than once, until the child's mouth opened up."

Sgt. Barr further testified that appellant admitted to having difficulty controlling himself with children, to perhaps being too rough in disciplining them, and to needing help in that area. Moreover, Barr continued, appellant said that Matthew had become injured during his disciplining on several occasions, and, although he did not intend to harm the child, that the bruises on his lower back were probably caused by striking him too hard.

Adrian Johnson spoke to appellant on December 25 and learned from him that he had been caring for the victim and had assumed a father role while living in the same house with the child's mother. According to Johnson, appellant first offered no explanation for the bruises noted on the victim's body and professed not to know how they had occurred. Upon several attempts at questioning him, however, appellant later speculated that the bruising on the victim's back and lower buttocks might have been caused by a seatbelt or by his brother pinching or hitting him. Johnson also testified that appellant related to her that he had noted symptoms of illness for two or three months, including off-and-on fevers, vomiting spells, and some disorientation and falling down; that the victim was a demanding child who frequently needed discipline; that he cried for hours, and that, as a result of a toilet training accident, he had spanked the victim approximately two days prior to his being brought to the hospital. Moreover, Johnson stated that appellant told her that he had been accused, in the past by the child's maternal and paternal grandparents and by his own parents of abusing the victim. She then testified as to the indicators of child abuse, relating her observations of appellant to those indicators.

In addition to denying, in his testimony at trial, that he battered or abused the victim, causing his death, appellant presented medical evidence to prove that the victim's brain swelling was not caused by a blunt injury or trauma. Dr.

Rudegin Breiteneker, a neuropathologist, and Dr. Richard Lindenberg, a forensic pathologist, both former Assistant State Medical Examiners, testifying as expert witnesses and noting the lack of evidence of trauma to the skull,[5] excluded trauma as the cause of the brain swelling. Instead, they opined that the swelling was due either to a viral infection or to the cut-off of the oxygen supply to the brain, most probably, as the result of "vomitus" in the victim's throat.[6] Both found Timothy's testimony, to the effect that the victim was "fine" on the day following the biting incident, to be supportive of their opinion, although Dr. Lindenberg was more adamant on that point.

### The Testimony of Adrian Johnson

Appellant contends that the trial court erred in allowing Adrian Johnson to testify as to the "classic indicators" of a child abuser and as to her observations of appellant, in that regard, during his interview at the hospital. Appellant further asserts that the trial court erred in allowing Johnson to relate a statement made to her by appellant that "he had been accused by the child's maternal and paternal grandparents and by his own parents in the past" of having abused the child.

We dealt with somewhat the same issue in *Duley v. State*, 56 Md.App. 275, 467 A.2d 776 (1983), and appellant finds support in its holding. In *Duley*, we held that the trial judge had erred in admitting the expert opinion of a

---

**5.** Neither Dr. Lindenberg nor Dr. Breiteneker examined the child's body; they relied on their review of the autopsy report and tissue slides. The bruising in the area of the victim's skull observed by the State's medical witnesses was attributed by appellant's witnesses to the action of a surgeon who drilled a hole in the victim's skull to accommodate a small drain tube.

**6.** Timothy testified that the victim had vomited on the day that he was brought to the hospital and that appellant cleaned the victim's mouth out before giving him mouth to mouth resuscitation.

pathologist as to a "child battering profile." [7]   Speaking on our behalf, Chief Judge Gilbert observed:

> The only thing on record relative to any expertise Dr. Blackbourne might possess as to the "battered child parent" is contained in the simple question by the state's attorney to the doctor:
>
>> Can you tell me whether or not in your research of the matter, have you had occasion to determine whether or not a certain type of individual might be more prone to commit this abuse?
>
> The answer to the question as we have seen above, was "Yes.  There is sort of a profile of common factors in a series of cases."  Other than that single question and response, there is not one word of testimony showing how, when, or where the doctor, a pathologist, acquired his expertise on the profile of the battered child's parent, nor was there any exploration into the extent or composition of the research performed by Dr. Blackbourne. Under the particular circumstances of this case, we deem that the trial judge should not have allowed the testimony relating to the profile of a battered child's parent.

56 Md.App. at 282, 467 A.2d 776.

■   In the instant case, the record reflects that Johnson has earned a master's degree in social work, and had been, at the time of trial, a licensed certified social worker for 13 years, during many of which she worked with families of child abuse victims.  She had also written a child abuse manual for Johns Hopkins Hospital, coordinated the first abuse team and conducted various workshops for Johns Hopkins and other facilities to train staff in identifying child abuse cases.  Moreover, she had been qualified on numerous occasions to testify as an expert in child abuse cases.  Thus, unlike the situation presented in *Duley,*

---

**7.** We determined the error to be harmless, however, in light of overwhelming evidence that Duley had hit his infant daughter hard enough to break her ribs and had shaken her hard enough to rupture the blood vessels in her brain.

Johnson was qualified to testify on the subject of child abuse. Therefore, the trial judge permitted her "to detail what in her opinion are characteristics of persons who are involved in child abuse and to describe the defendant's responses, reactions, and what-not."

And Johnson did state her opinion as to what constituted "classic indicators" of a child abuser, along with her observations as to appellant's responses to her questions, and she related appellant's conduct to certain of the indicators that she described.[8] Furthermore, she was allowed to testify that appellant told her "that he had been accused by the child's maternal and paternal grandparents and by his own parents in the past" of having abused the victim.

Another basis for our finding of error in *Duley* was that the "child battering profile" testimony was irrelevant. We held that such evidence as there presented had no probative value with respect to identifying a particular defendant as a criminal agent. We also said that profile evidence is highly prejudicial since it invites a jury to conclude that because an expert experienced in child abuse cases identifies an accused as someone fitting a particular profile, it is more likely than not that this individual committed the crime. *See State v. Steward,* 34 Wash.App. 221, 224, 660 P.2d 278 (1983); *see also* Bulleit, *Battering Parent Syndrome, Inexpert Testimony as Character Evidence,* 17 U.Mich.J.L.Ref. 653, 659 (1984). Notwithstanding the court's instruction,[9] given prior to Johnson's opinion testimony, and Johnson's expertise, what we said in *Duley* applies equally to the evidence *sub judice.*

---

**8.** For example, Ms. Johnson opined that appellant's conduct of initially denying involvement, of blaming Timothy for having caused the bruises, and of not seeking medical attention for the child are classic indicators of a child abuser.

**9.** The court instructed the jury:
   Because the testimony is coming in it does not necessarily relate to this defendant unless you find it relates to him, so with that understanding and with that admonition, I'm going to permit this type of testimony to come in....

■ We hold that testimony presented by an expert witness regarding the "indicators of a child abuser" and the expert's observations relating an accused's conduct to such indicators is error. We further hold that it is error to admit accusations of others, not present at trial, to establish criminal agency.

The State argues that any error in the admission of Johnson's testimony is harmless beyond a reasonable doubt. It relies on *Duley* and what it characterizes as the "overwhelming evidence of the appellant's guilt" presented in the instant case. We do not agree.

■ *Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665 (1976) enunciated the standard to be applied to the determination whether error is "harmless":

> [w]hen an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed "harmless" and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of—whether erroneously admitted or excluded—may have contributed to the rendition of the guilty verdict.

We set out in some detail the evidence that was before the jury. That evidence was conflicting on the issues of the cause of death and appellant's criminal agency. In fact, the defense medical testimony was diametrically opposite that of the State on both issues. Under these circumstances, it is impossible to determine what evidence was decisive to the jury. Accordingly, we are unable to say, under the facts of this case, that Johnson's testimony, either as to the classic indicators or as to the accusations of others, did not contribute to the guilty verdict in this case. *Duley* is inapposite on this point.

The test of the sufficiency of the evidence to support a criminal conviction on appeal is "whether, after viewing the

evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime, beyond a reasonable doubt." (emphasis in original) *Jackson v. Virginia* 443 U.S. 307, 318, 99 S.Ct. 2781, 2788, 61 L.Ed.2d 560 (1979). *See Bloodsworth,* 307 Md. at 167, 512 A.2d 1056; *Branch v. State,* 305 Md. 177, 182–93, 502 A.2d 496 (1986); *Tichnell v. State,* 287 Md. 695, 717, 415 A.2d 830 (1980). Moreover, as observed by Judge Moylan in *Evans v. State,* 28 Md.App. 640, 703, 349 A.2d 300 (1975), "[T]he whole phenomenon of circumstantial evidence is the phenomenon of inferring facts in issue from facts established." The test for sufficiency of evidence, however, is identical whether the evidence be direct, circumstantial, or provided from rational inferences. *Dove v. State,* 47 Md.App. 452, 423 A.2d 597 (1980); *Metz v. State,* 9 Md.App. 15, 262 A.2d 331 (1970).

■ Excising Johnson's testimony insofar as it relates to the classic indicators of child abuse and the accusations of others, not in court, and applying the applicable test to what remains, we are satisfied and, therefore, hold that the evidence is indeed sufficient to sustain convictions for both manslaughter and child abuse. Accordingly, we must remand for a new trial.

JUDGMENTS REVERSED. CASE REMANDED FOR NEW TRIAL.

COSTS TO BE PAID BY ANNE ARUNDEL COUNTY.

GARRITY, Judge, dissenting.

I respectfully dissent from the majority's opinion.

I agree that it was improper for the trial judge to allow Ms. Adrian Johnson to relate her opinion that certain of the appellant's acts fell within the profile of a child abuser. I am convinced, however, that the direct evidence of appellant's criminal agency was so overwhelming that there is *no reasonable possibility* that the testimony surrounding the mere "indicators of a child abuser" influenced the verdict. Moreover, assuming it was error to allow Ms. Johnson to

testify that the appellant told her "that he had been accused by the child's maternal and paternal grandparents and by his own parents in the past" of having abused the child, in addition to the appellant's admissions related to others, there was overwhelming direct evidence presented by the victim's brother that the appellant had, in fact, abused the infant. The errors were harmless.

When two-year-old Matthew Harrison was presented to the Johns Hopkins Pediatric Intensive Care Unit, he was found to be unconscious, in a deep coma induced by a swollen brain, unable to breathe on his own, and exhibiting signs of having been physically and sexually abused. According to Dr. Myron Yaster, the attending physician, Matthew was in a severely critically ill state and in danger of imminent brain death. Dr. Yaster advised the jury,

> I think the thing that struck us the most was that not only was he in a coma, but he had signs of physical abuse, and that sort of locks in the diagnosis for us. Although there may be many things that can cause head trauma, or head swelling, there are very few things that will cause signs of being beaten. This child had physical signs of being beaten and he also had signs that he was sexually assaulted.

As to the child's head injury, Dr. Yaster stated,

> When you see this kind of cerebral edema, this kind of brain swelling, it doesn't happen by simple accidents, it happens when there is a major trauma to the patient . . . I am talking about somebody who would be bashed or a very hard physical shaking.

Dr. Ivor Berkowitz, who also treated Matthew at Johns Hopkins, concurred with Dr. Yaster's opinion and stated that a CAT scan evidenced the presence of cerebral edema, that he had observed bruises on the child's left and right frontal-temporal area, and that the child's anus had been injured in such a manner as to be "highly suggestive that the child had been sexually molested."

The victim's brother, Timothy Harrison, 14 years-of-age, testified that when Matthew locked his teeth on the appellant's finger, the appellant hit Matthew's head up against the window ledge of the truck's door panel three times until the child opened his mouth and started crying. That episode had occurred on a Friday. The following day, according to Timothy, his brother seemed "fine." On Sunday night, however, Timothy noticed that his brother was acting like he was "kind of sick." After an episode of diarrhea and vomiting on Monday afternoon, the child lapsed into a coma. Matthew expired two days later.

The cause of death, according to Dr. Dennis Smyth, Assistant State Medical Examiner, who performed an autopsy on the child, was "swelling of the brain ... [due to] a blunt injury or trauma to the head." That conclusion was supported by his finding of bruises on the forehead and an extensive hemorrhage area under the scalp. Indeed, his conclusion as to the cause of the brain swelling was consistent with that of Drs. Yaster and Berkowitz. Both doctors explained that the swelling of the brain may have been gradual over a period of several days. Contrary to this evidence, the defense presented the testimony of two doctors who had examined tissue slides and Dr. Smyth's autopsy report. They denied that it was possible that the child's death had been caused by the actions of the appellant that had been described in Timothy Harrison's testimony.

In any event, the factual controversy over the cause of death was for the jury to resolve after weighing the testimony of the medical experts. In the pursuit of this task, I am convinced that there is no "reasonable possibility" that the "profile" opinion of the social worker influenced the jury's finding of fact as to the cause of death.

Maryland's statute on child abuse, Md.Ann.Code art. 27, § 35A, is designed to prohibit the infliction of injury to a child as a result of cruel or inhumane or malicious acts, and any sexual abuse of a child regardless of the presence of physical injury.

Although the "characteristics" of a child abuser were related to the jury, testimony which tended to "establish" the appellant's direct involvement in such conduct was spread before the panel when Detective Sgt. Barr related that the appellant admitted having difficulty controlling himself with children, that perhaps he was too rough, that Matthew had been injured during his disciplining on several occasions, and that the appellant thought he needed help in that area. These admissions by the appellant must be coupled with Timothy's description as to the appellant's treatment of his brother, as well as the testimony of the examining physicians and the appellant's cellmate who related the appellant admitted to him that he had performed a sexual act on the child. In light of such overwhelming evidence as to the appellant's criminal agency, Ms. Johnson's "profile" opinion pales to utter insignificance.

From my review of the record, I believe beyond a reasonable doubt that there is no reasonable possibility that the errors relating to Mrs. Johnson's testimony influenced the jury verdict. I would affirm the judgments.